## In re LIVENT, INC. SECURITIES LITIGATION.

**This Document Relates to All Actions.**

**No. 98 Civ. 5686 (RWS).**

United States District Court,
S.D. New York.

Dec. 10, 1999.

196

**198**

Beatie and Osborn, New York City (Daniel A. Osborn, of counsel), Berger & Montague, Philadelphia, PA (Sherrie R. Savett, Jeanne A. Markey, Arthur Stock, of counsel), Shiffrin & Barroway, Bala Cynwyd, PA (Marc A. Topaz, of counsel), for Plaintiffs.

Gibson, Dunn & Crutcher, New York City (John T. Behrendt, Peter J. Beshar, Deborah Verdile, of counsel), for Defendant Deloitte Touche.

Wachtell, Lipton, Rosen & Katz, New York City (Eric M. Roth, Elaine Golin, of counsel), for Defendant A. Alfred Taubman.

Weil, Gotshal & Manges, New York City (Greg A. Danilow, Stephen A. Radin, of counsel), for Defendant H. Garfield Emerson.

O'Sullivan Graev & Karabell, New York City (Bradley J. Butwin, Jonathan Rosenberg, of counsel), for Defendant Martin Goldfarb.

Fried, Frank, Harris, Shriver & Jacobson, New York City (Harvey L. Pitt, Mark J. Stein, of counsel), for Defendant Garth H. Drabinsky.

Richards Spears Kibbe & Orbe, New York City (Lee S. Richards, Daniel C. Zinman, of counsel), for Defendant Myron Gottlieb.

Morvillo, Abramowitz, Grand, Iason & Silberberg, New York City (Barry A. Bohrer, James C. Dugan, of counsel), for Defendant Maria M. Messina.

Davis Weber & Edwards, New York City (Sidney Davis, Stacy Kellner Rosenberg, of counsel), for Defendant Robert Topol.

## OPINION

SWEET, District Judge.

Defendants Garth A. Drabinsky ("Drabinsky"), Myron Gottlieb ("Gottlieb"), Robert Topol ("Topol"), Maria M. Messina ("Messina"), H. Garfield Emerson ("Emerson"), Martin Goldfarb ("Goldfarb"), A. Alfred Taubman ("Taubman"),[1] and Deloitte & Touche Canada ("D & T"), have moved to dismiss this action, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, for failure to plead scienter and fraud with sufficient particularity. Additionally, Drabinsky, Gottlieb, Topol, Messina, and D & T move to dismiss on the grounds of *forum non conveniens*. Drabinsky and Gottlieb further move, pursuant to Rule 12(f), to strike certain allegations in Plaintiffs' complaint. For the reasons set forth below, the motions are granted in part and denied in part.

### The Parties

Plaintiffs are members of a class of persons (the "Class") who purchased or acquired the common stock of Livent, Inc. ("Livent" or the "Company") between March 5, 1996 and August 7, 1998 (the "Class Period"). The Class representatives include both U.S. and Canadian citizens.

---

1. Drabinsky, Gottlieb, Topol, Messina, Emerson, Goldfarb, and Taubman are collectively referred to herein as the "Individual Defendants." Furthermore, Emerson, Goldfarb, and Taubman are sometimes referred to as the "Outside Directors" while Drabinsky, Gottlieb, Topol, and Messina are sometimes referred to as the "Insider Defendants."

Livent is a Canadian-based producer of live theatrical entertainment, including "Ragtime," "The Phantom of the Opera," "Showboat," "Sunset Boulevard," and "Fosse." The Company owns and/or operates theatres in Toronto, Vancouver, Chicago, and New York. Livent became a public company in Canada in May 1993 and registered its common stock in the United States in May 1995. The Company is named as a nominal defendant. It filed for bankruptcy protection in the United States on November 19, 1998, and all proceedings against it are stayed.

Drabinsky was a co-founder of Livent, and Chairman of its Board of Directors (the "Board") and Chief Executive Officer from December 1989 until June 15, 1998. From June 15 until August 10, 1998, he held the position of Vice Chairman and Chief Creative Director of the Company. He was suspended on August 10 and fired on November 18, 1998. Drabinsky is a Canadian citizen and resident. He owns an apartment in Manhattan.

Gottlieb was a co-founder of Livent, President and Chief Operating Officer from December 1989 until June 15, 1998, a member of the Board from 1993 to 1998, and Executive Vice–President of Canadian Administration from June 15, 1998 until August 10, 1998, at which point he was suspended. He was fired on November 18, 1998. Gottlieb is a Canadian citizen and resident.

Topol was Livent's Executive Vice President from 1989 until 1994, when he became Senior Executive Vice President. He was Chief Operating Officer from 1997 until his resignation on February 25, 1998. Topol is a Canadian citizen and resident.

Messina joined Livent in May 1996 as Vice President of Finance. Previously, she had been D & T's engagement partner for Livent's 1995 audit, and had worked on Livent's audits since 1993. In November 1996, she became the Company's Chief Financial Officer, and subsequently its Senior Vice President of Finance and Administration. Messina is a Canadian citizen and resident.

Emerson was a member of Livent's Board of Directors and served as Chairman of the Audit Committee during the Class Period. Defendants Goldfarb and Taubman were members of the Board and of the Audit Committee. Emerson and Goldfarb are Canadian residents. Taubman is a U.S. citizen and resident.

D & T is a Canadian entity affiliated with Deloitte & Touche, L.L.P., a United States limited liability partnership. D & T served as Livent's auditor and principal accounting firm prior to and continuing through the Class Period.

### Prior Proceedings

The first of the numerous actions arising from the events described below was filed with this Court on August 11, 1998. A December 3, 1998 order of this Court consolidated the pending actions and approved of the selection of lead plaintiffs and counsel.

On January 13, 1999, the Securities and Exchange Commission (the "SEC") filed a separate suit against Drabinsky, Gottlieb, Topol, Messina, and other former officers and employees of the Company, for alleged violations of the securities laws arising out of the same events as those giving rise to the instant action. *See SEC v. Drabinsky et al.*, No. 99 Civ. 0239 (S.D.N.Y.).

On February 1, 1999, Plaintiffs in this action filed an amended class action complaint.

Defendants filed the instant motions on May 14, 1999. Memoranda of law in support and opposition, and declarations and affidavits, were received through September 8, 1999, at which point oral argument was heard and the motions were deemed fully submitted.

### Background

On a motion to dismiss under Rule 9(b) or Rule 12(b)(6), the facts alleged in the complaint are presumed to be true, and all factual inferences are drawn in the plain-

tiff's favor. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). Accordingly, the facts presented here are drawn from the allegations of Plaintiffs' amended class action complaint (the "Complaint") and do not constitute findings of fact by the Court.

■■■ The presumption on factual inferences does not apply to a *forum non conveniens* motion. A *forum non conveniens* inquiry goes to the court's subject matter jurisdiction over the action, and "[i]n resolving the jurisdictional dispute, the district court must review the pleadings and any evidence before it, such as affidavits." *Cargill Intern. S.A. v. M/T PAVEL DYBENKO*, 991 F.2d 1012, 1019 (2d Cir.1993).

Livent, formed in 1989, was a seemingly successful producer of live theatre. It became a publicly traded company on the Toronto Stock Exchange in May 1993, and subsequently registered its common stock in the United States in May 1995. Throughout the Class Period, Livent's common shares were actively traded in the United States on NASDAQ. Trading in the stock on NASDAQ exceeded trading on the Toronto Exchange by a ratio of 3 to 1. During this time, Livent filed with the SEC quarterly and annual reports for the fiscal years 1995, 1996, and 1997.

Throughout the Class Period, Livent obtained sizeable amounts of American capital to finance its business activities, in each instance filing a Registration Statement and Prospectus with the SEC. For example, on or about April 2, 1996, the Company completed a U.S. equity offering raising $29.5 million through the issuance of 3.75 million shares of common stock. In October 1997, Livent raised $120 million by issuing 9 3/8% unsecured notes offered to American and Canadian investors.

In 1998, Drabinsky approached Lynx Ventures, L.P. ("Lynx"), a company headed by Michael Ovitz ("Ovitz"), a prominent Hollywood entertainment executive. Lynx invested $20 million in Livent in return for 2.5 million shares, or 12% of the Company. As part of the deal, Drabinsky and Gottlieb relinquished voting control of their shares and stepped down from their management positions, assuming purely creative roles. Roy Furman ("Furman"), a Wall Street financier, was installed as Chief Executive Officer, David Maisel ("Maisel") became President, and Robert Webster ("Webster") became Executive Vice President.

A few months later, Webster discovered that the Company had entered into certain agreements, described in more detail below, that, while appearing to be revenue generating deals, were potentially worthless. Webster asked the staff whether there were any other unusual financial situations that had not been disclosed. On August 6, 1998, a handful of Livent personnel, led by Messina, admitted that they had information that would cast doubt on the veracity and accuracy of Livent's financial reports. Over the next two days, Webster and attorneys from the law firm of Stikeman Elliot began interviewing employees.

On the evening of Sunday, August 9, the company's directors gathered by conference call in Toronto. Ovitz, Furman, and Maisel were joined by several other directors; Gottlieb and Drabinsky were not invited. The directors concluded that Livent's financial statements for 1996 and 1997 and the first quarter of 1998 would need to be restated as soon as possible after KPMG Investigation and Security Inc. could review the Company's books for any more accounting irregularities. In the meantime, Gottlieb and Drabinsky would be suspended from their management positions.

The next day, the Company issued a press release announcing that it would restate its previously reported financial results for the fiscal years 1996 and 1997 and the first quarter 1998, because it had uncovered serious irregularities in the Company's financial records. NASDAQ and the Toronto Stock Exchange immediately

halted trading of the Company's stock. Drabinsky and Gottlieb were formally suspended by the Board.

On November 19, 1998, the Company also (a) filed for bankruptcy in the United States, (b) sued Drabinsky and Gottlieb, and (c) fired the two men. The Company's lawsuit seeks $225 million . in damages; Drabinsky and Gottlieb countered with their own suit, claiming a conspiracy by the Company.

On December 14, 1998, defendant Messina and four of her assistants were fired by the Company. On December 16, the Royal Canadian Mounted Police raided Livent's offices as part of the investigation being conducted by its Commercial Crime Unit, which looks into fraud and stock market manipulation cases.

The SEC suit filed on January 13, 1999 against Drabinsky, Gottlieb, Topol, Messina, and other former officers and employees of the Company, alleges "a multifaceted and pervasive accounting fraud spanning eight years from 1990 throughout the first quarter of 1998." The SEC is seeking to bar permanently Drabinsky, Gottlieb, Topol, and Gordon Eckstein ("Eckstein," who is not a moving party here but is a defendant in the instant action) from serving as officers or directors of public companies. *See SEC v. Drabinsky et al.,* No. 99 Civ. 0239 (S.D.N.Y.). The SEC simultaneously announced that it had already settled related civil and administrative actions against, among others, Eckstein.

The gravamen of the Complaint in this action is that the Individual Defendants fraudulently portrayed the financial condition of Livent to the public, and that D & T knew, or was reckless in not knowing, of the fraud. The Individual Defendants are alleged to have understated expenses in order to inflate earnings; recognized as revenue what in reality were loans; portrayed unsuccessful theatrical productions as profitable; and fabricated earnings re-

sults to meet quarterly and annual projections the Company provided to Wall Street analysts. The cumulative pre-tax effect of the alleged accounting irregularities totaled more than Canadian $98 million.[2] Defendants allegedly achieved this manipulation in at least four ways:

(a) various sales agreements between Livent and third parties contained side agreements that required Livent to pay back amounts advanced by the other parties to the agreements; thus, transactions that were booked as revenue should have been booked as loans;

(b) costs associated with particular shows (that would otherwise be expensed in a particular time period) were transferred to fixed asset accounts and capitalized;

(c) costs from a currently running show were transferred to another show that had not yet opened or that had a longer amortization period; and

(d) expense and accounts payable entries were removed from the books and records of Livent.

Drabinsky, Gottlieb, Eckstein, Topol, and Messina are alleged to have actively participated in the fraud. Two senior level controllers, Diane Winkfein ("Winkfein") and Grant Malcolm ("Malcolm"), effected the accounting adjustments directed by Eckstein; Malcolm also maintained separate records showing the adjustments so that Drabinsky, Gottlieb, and others could track the manipulations and know Livent's true financial condition. Livent's theatre controller, Tony Fiorino ("Fiorino"), knew about the accounting manipulations and participated in the fraudulent transfers to fixed asset accounts.

As a result of the scheme, Livent reported inflated pre-tax earnings, or understated pre-tax losses, for each of its fiscal years 1995 through 1997 and for the first quarter of 1998. For fiscal 1995, Livent reported materially overstated pre-tax

2. Dollar figures are Canadian unless otherwise indicated.

earnings of $18.2 million when, in fact, it should have reported materially lower earnings, if, in fact, it even had earnings for 1995. For fiscal 1996, Livent reported pre-tax earnings of $14.2 million when, in fact, the Company incurred a pre-tax loss of more than $24.9 million. For fiscal 1997, Livent reported a pre-tax loss of $62.1 million when the Company's true loss was at least $83.6 million.

As a further result of the scheme, Livent reported preproduction costs or fixed assets that were fraudulently. overstated for fiscal years 1994 through 1997. For fiscal 1994, 1995 and 1996, respectively, Livent reported preproduction costs of $28 million, $55.4 million and $75.6 million. Each of these amounts was materially overstated. In addition, for fiscal 1996, Livent reported fixed assets of $133.2 million, which was materially overstated by at least $6 million. For fiscal 1997, Livent reported fixed assets of $200.8 million, which was materially overstated by approximately $23.9 million.

In November 1998, following the discovery of the fraud and a subsequent independent investigation, Livent restated the Company's financial statements for the years 1996 through the first quarter of 1998. D & T then withdrew its original audit opinion on the Company's financial statements for the years 1995 through 1997. The restatement resulted in a cumulative adverse effect on net income in excess of $98.2 million.

When trading briefly resumed following release of the restatement, Livent stock plummeted over ninety-five percent, from U.S. $6.75 per share to approximately U.S. $.28 per share, and lost over $100 million in market capitalization. On January 6, 1999, NASDAQ delisted the Company.

As indicated in Livent's proxy statement dated April 16, 1997, during the Class Period the mandate of Livent's Board was to supervise the management of the business and affairs of the Company and to act with a view to the best interests of the Company. In fulfilling its mandate, the Board, among other matters, was to discuss the strategic planning process of the Company with senior executives, review the annual budget of the Company, consider the interim unaudited financial statements for the first three quarters of the fiscal year of the Company, approve the annual audited financial statements of the Company, and, in conjunction with the quarterly reviews, analyze any major variances between the actual performance of the Company to that contained in the current budget and to that of the performance for the comparable period in the preceding fiscal year.

The Audit Committee of the Livent Board was responsible for reviewing the Company's financial reporting procedures, internal controls and management information systems, and the performance of the Company's external auditors. The Audit Committee, prior to a general review by the Board, was also responsible for reviewing the quarterly unaudited financial statements and the annual audited financial statements. Such quarterly reviews were to extend to a review of management's estimates of the unamortized preproduction costs of the various productions undertaken by the Company in order to determine whether any adjustment thereto was required pursuant to the forecasting methodology adopted by the Company.

### The Specifics of the Fraud

#### A. Fraudulent "Revenue–Generating" Transactions

The Individual Defendants are alleged to have caused Livent to enter into agreements with third parties that included undisclosed side agreements, obligating Livent to repay, in part or in whole, sums earned under the agreements. (Compl. ¶ 30.) Under U.S. and Canadian Generally Accepted Accounting Principles ("GAAP"), funds received on an understanding that they are to be repaid are not revenue. (*Id.* ¶ 31.) Nevertheless, Livent's audited financial statements for fiscal years 1995, 1996 and 1997 improperly

recorded at least $34 million in revenue through the following transactions orchestrated by "Drabinsky, Gottlieb and the others"

### 1. *Pace Theatrical Group*

In 1996 and 1997, Livent purported to sell Pace Theatrical Group, Inc. ("Pace"), a Texas-based theatrical company, the exclusive rights to present "Showboat" and "Ragtime" in various theatres in North America for fees totaling U.S. $11.2 million. These purported agreements were contained in contracts or letters dated June 15, 1996 and August 8, 1997, with respect to "Showboat," and December 18, 1996 and August 8, 1997, with respect to "Ragtime." Each of these agreements was signed, and in part negotiated, at Pace's office in New York City. In return for payment of the fees, Pace was to be reimbursed for all theatre expenses to present the shows and was entitled to a limited percentage of adjusted gross ticket sales as profit participation. All of these agreements purported to make the fees nonrefundable, even if Livent never made the shows available to Pace. (*Id.* ¶ 35.)

On the basis of these agreements, Livent recognized as revenue in its financial statements the present value of the fees in the amounts of $12.2 million for fiscal 1996 and $1.6 million for fiscal 1997. For purposes of the Company's year-end 1996 reconciliation to U.S. GAAP, Livent deferred recognition of $6 million related to the sale of rights to "Ragtime". Livent subsequently improperly recognized that amount in fiscal 1997. (*Id.* ¶ 36.)

However, the agreements did not actually require any irrevocable payments by Pace. Pace required side letters to these agreements that granted Pace the right to recoup its fees, plus earn additional profit, as the shows were performed. These side letters were dated the same date, or days or weeks after the underlying sales agreements: the side letters for "Showboat" were dated June 17, 1996 and August 20, 1997; and the side letters for "Ragtime" were dated December 18, 1996 and August 20, 1997. Each of these side letters was signed, and in part negotiated, at Pace's office in New York City. (*Id.* ¶ 37.)

### 2. *American Artists*

In 1997, pursuant to an agreement dated September 9, 1997, Livent sold American Artists Limited Inc. ("American Artists"), a Massachusetts-based theatre owner and operator, the right to present "Ragtime" in three theatres for a fee of U.S. $4.5 million. The agreement purported to make the fee nonrefundable, regardless of whether Livent made "Ragtime" available to American Artists. However, two side letters, dated September 29 and November 15, 1997, signed by Topol and by American Artists, permitted American Artists to recoup its fees in two ways: through fixed weekly amounts when the shows were performed, and through "consulting fees" for the services of American Artists' president, Jon Platt. These side letters, as well as the September 9, 1997 rights agreement, were signed, and negotiated in part, in November 1997 in New York City. As a result, Livent fraudulently recorded approximately $5.8 million, the present value of the fee, in its financial statements for the third quarter of 1997 and fiscal 1997. (*Id.* ¶ 39.)

### 3. *CIBC Wood Gundy Capital*

In December 1997, Gottlieb negotiated a contract purporting to memorialize the sale of an interest in the production rights of "Showboat" and "Ragtime" in the United Kingdom and other countries to CIBC Wood Gundy Capital ("Wood Gundy"), an investment bank and subsidiary of the Canadian Imperial Bank of Commerce, Livent's principal banker. In return, Wood Gundy was entitled to certain royalty payments from the shows. The agreement, valued at $4.6 million, also gave Livent the right, until June 30, 1998, to repurchase the production rights. Under the agreement, the fee from Wood Gundy was nonrefundable, and Livent had no obligation

to stage the plays or to exercise its repurchase option. Thus, Wood Gundy purportedly assumed all risks that it would never recoup any fees or make any profit from the transaction. These terms were set out in an agreement dated December 23, 1997. Based on this agreement, Livent recorded revenue of approximately $4.6 million in its financial statements for fiscal 1997. (*Id.* ¶ 41.)

In fact, Gottlieb had negotiated two side letters with Wood Gundy, both of which were also dated December 23, 1997. The side letters provided two mechanisms for Wood Gundy to recoup its fees and make significant profits. If Livent exercised the repurchase option, Livent would repay all fees, plus 112,500 British pounds, plus any unpaid royalties; if Livent did not exercise the repurchase option, Livent would pay Wood Gundy an additional royalty equal to 10% of the adjusted gross weekly ticket sales of the Broadway production of "Ragtime," which was expected to run for years and generate a weekly royalty of approximately U.S. $90,000. Based on this arrangement, Wood Gundy would earn at least a 40% return if Livent repurchased the rights, and well over 100% if Livent did not. (*Id.* ¶ 43.)

The transaction provided Livent with "bridge" financing until it could sell the production rights to a U.K. investor after "Ragtime" opened on Broadway in early 1998. When it became clear in early August of 1998 that Livent's new management did not know about the side agreements, Gottlieb asked the managing director of Wood Gundy who negotiated the transaction not to disclose the side agreements to new management so that Gottlieb could cause Livent to repurchase the rights from Wood Gundy. (*Id.* ¶ 44.)

#### 4. *Dundee Realty Corporation*

In May 1997, Livent acquired from the City of Toronto title to lands adjoining the Pantages Theatre (the "Pantages Place Lands"). A portion of the Pantages Place Lands were to be used to extend the back-stage of the existing Pantages Theatre, to commence construction in 1999 of a new theatre of approximately 1,400 seats, and to construct an underground parking facility and approximately 3,300 square feet of retail space (collectively the "Pantages Place Project"). (*Id.* ¶ 45.)

Drabinsky and Gottlieb advised the Livent Board that at the end of the second quarter of 1997, Livent had sold the excess density rights over its existing theatre and its theatre expansion and the density rights over the land not used by the Pantages Place Project for $7.4 million to a third-party corporation, Dundee Realty Corporation ("Dundee"), a Canadian company. Gottlieb was a director and shareholder of Dundee's parent corporation, Dundee Bancorp Inc. However, Livent failed to disclose this as a related party transaction in its fiscal 1997 annual report. The purpose of this sale was to enable Dundee to construct a hotel/condominium on a portion of the Pantages Place Lands not to be used in the Pantages Place Project. Livent was also to receive a minority interest in the development company owned by Dundee that was to construct the hotel/condominium. (*Id.* ¶ 46.)

Under the master agreement for the project, dated June 30, 1997, Livent and Dundee created a joint venture company and Livent sold Dundee the excess density rights over the land for $7.4 million. However, the parties entered into a separate "Put" agreement (the "Put Agreement"), dated August 15, 1997, enabling Dundee to withdraw from the project and cause the joint venture, and therefore Livent, to repay Dundee's investment. (*Id.* ¶ 47.)

In August 1997, an issue was raised with the Audit Committee regarding the timing of the transactions as well as the revenue recognition for the second quarter of 1997, which ended June 30, 1997. At that time, D & T, which was also the independent auditor for Dundee, announced that they had found the Put Agreement. Under GAAP, the Put Agreement created a mate-

rial contingency preventing recognition of the $7.4 million as income in 1997. Gottlieb misrepresented that the Put Agreement had been cancelled. The existence of the Agreement cast significant doubt on the integrity of defendants Gottlieb and Drabinsky, who had previously never mentioned the Put Agreement and had provided verbal assurances directly and/or indirectly to D & T and to the Livent Audit Committee that Livent had fulfilled all of its significant obligations under the agreement with Dundee and that there were no provisions in the arrangement with Dundee which created future contingencies before a sale could be recognized as revenue. (*Id.* ¶ 48.)

The issue rose again in discussion with the Audit Committee during the year-end audit in April 1998. On or about April 9, 1998, Gottlieb expressly stated to the Audit Committee that no such put agreement or arrangement existed and provided a letter from the Chairman of Dundee as confirmation. However, in a letter dated April 6, 1998 to Dundee's President, Drabinsky and Gottlieb confirmed to Dundee that the Put Agreement was in place and effective as between Livent and Dundee. The letter read in pertinent part as follows: "accordingly, we wish to confirm that notwithstanding [Dundee's Chairman] letter to me of April 4, 1998, a copy of which is attached hereto, the "PUT" agreement referred to in [Dundee's Chairman] letter is binding and effective and remains so in favor of Dundee ... as if it had never been cancelled." (*Id.* ¶ 50.)

Revenue recognition from this transaction violated GAAP in two ways. First, any oral agreement to cancel the Put Agreement was contingent upon Gottlieb renegotiating the joint venture agreement to ensure to Dundee's satisfaction that Dundee's rights remained secure. Thus, even if the Put Agreement was canceled, recognition of revenue was improper because the contract was not a final, consummated sale. Second, Gottlieb and Drabinsky's April 6, 1998 letter "reinstating" the

Put Agreement, and the new May 27, 1998 Put agreement, which Gottlieb entered into with Dundee, confirm that Gottlieb and Drabinsky considered it to be binding on Livent all along. Accordingly, the existence of the Put Agreement made the transaction an investment that did not qualify for revenue recognition under GAAP. (*Id.* ¶ 51.)

### 5. *Dewlim Investments Limited*

In 1996, Gottlieb negotiated the sale of an interest in the production rights to "Showboat" in Australia and New Zealand to Dewlim Investments Limited ("Dewlim"), a British Virgin Islands company, for a $4.5 million fee. The original agreement was dated October 21, 1996, and revised by agreement dated November 3, 1997. As with the other rights sales, the sale agreement made the fee non-refundable. (*Id.* ¶ 52.)

Again, this transaction was not a sale but a financing. In or about October 1996, Gottlieb and Drabinsky orally promised Dewlim's former owner, Andrew Sarlos, that Livent would repay the fee Dewlim advanced for the production rights, plus 10% interest. This arrangement is memorialized in a June 9, 1998 memo from Gottlieb to Drabinsky. It states that as "an inducement" for the "Showboat" transaction, "we committed to Dewlim on behalf of Livent that Dewlim would recoup by December 31, 2000 all capital together with interest accrued monthly at the rate of 10% per annum." As a result of this concealed arrangement, Livent improperly recorded as revenue the present value of the fee, $4.2 million, in fiscal 1996; no revenue was recorded under U.S. GAAP in fiscal 1996 or 1997. (*Id.* ¶ 53.)

This was a related party transaction in two respects. First, at the time of the transaction, Sarlos (now deceased) was a director of Livent and chairman of Livent's Audit Committee. Additionally, in October 1996, Gottlieb had pledged his personal Livent stock to Dewlim as security for the $4.5 million loan. Neither of these

related party transactions was disclosed in Livent's annual report for fiscal 1996 or 1997. (*Id.* ¶ 54.)

The Complaint alleges that each of the five transactions described above was economically irrational on its face when reported as revenue, because the transactions did not obligate performance from Livent or permit the counterparties to obtain refunds. In addition, the Complaint alleges for each transaction that D & T made no effort to independently verify the terms of the transaction and failed to examine sufficient competent evidentiary matter to be able to opine as to the appropriateness of the accounting treatment. (*Id.* ¶¶ 38, 40, 42, 49, 55, 56.)

### B. *Fraudulent Manipulation of Livent's Books and Records*

Beginning in 1994 and continuing through the first quarter of 1998, Drabinsky and Gottlieb and several of the other Individual Defendants engaged in a deliberate manipulation of Livent's books and records, thereby understating expenses in each fiscal quarter in order to inflate earnings, and violating GAAP. By redacting expenses on losing shows, Drabinsky and Gottlieb were able to portray the productions and the Company as financially successful. In quarterly periods, this enabled Drabinsky, Gottlieb and Topol to meet the earnings and operating projections provided to Wall Street analysts. (*Id.* ¶ 57.)

Three manipulative devices were used. First, preproduction costs for shows were transferred to fixed asset accounts such as the construction of theatres. Preproduction costs, which include costs for advertising, sets and costumes, are incurred prior to the opening of the production. Livent's accounting policy called for preproduction costs to be expended through amortization once a production began, for a period not to exceed five years. Fixed assets, on the other hand, were depreciated over their useful life, up to forty years for buildings. The manipulations thus significantly decreased show expenses, and inflated profits, by fraudulently amortizing preproduction costs over a much longer period of time. In 1997, for example, Livent transferred preproduction costs and certain show operating expenses totaling $15 million from six different shows in 30 locations to three different fixed asset accounts. (*Id.* ¶ 58.)

The second manipulative device involved erasing expense entries and related liabilities from the general ledger. At the end of each quarter, Drabinsky and Gottlieb would review the Company's financials and erase numbers they did not like; in the succeeding quarter, the expenses and related liabilities would be re-entered in the books as original entries. (*Id.* ¶ 59.)

The amount of expenses moved from current periods to future periods was internally tracked in a separate set of ledgers referred to as the "Expense Roll," permitting significant reductions in show expenses while also increasing profits. (*Id.* ¶ 60.)

Finally, the Individual Defendants transferred costs from one show currently running to another show that had not yet opened or that had a longer amortization period, increasing profits in a particular quarter by reducing the charge for amortization of preproduction costs, since amortization is only appropriate once a production has begun. For example, in 1996 and 1997, approximately $12 million relating to seven different shows and 27 different locations was transferred to the accounts of approximately 31 different future locations and ten other shows then in progress. All three manipulations violated the Company's express accounting policies and GAAP. (*Id.* ¶ 61.)

The Complaint alleges that the defendants, including D & T, were knowledgeable of this manipulation or were reckless in failing to detect it. The accounting staff and auditors were aware of Livent's announced policy that costs of cancelled shows would be expended at the time of cancellation. The fact that particular

shows had ended their runs was well known. The absence of any writedown at the time of the show's end inevitably meant that the Company was not following its own accounting policies. (*Id.* ¶ 62.)

As with the Expense Roll, the amount of amortization moved from current periods to future periods was internally tracked at Livent in a separate set of ledgers; the Individual Defendants referred to these books as the "Amortization Roll." (*Id.* ¶ 63.)

The cumulative impact of these accounting irregularities caused Livent to materially understate expenses by approximately $3.5 million in fiscal 1995, $18 million in fiscal 1996, and $8.5 million fiscal 1997, and to overstate expenses in the first quarter of 1998 by $2.7 million. (*Id.* ¶ 64.)

The accounting manipulations were orchestrated by Drabinsky and Gottlieb but included active participation from the other Individual Defendants as well as members of senior management and accounting department personnel. The scheme was methodical, comprehensive and ongoing and was carried out on a regular basis from about 1995 through mid–1998. (*Id.* ¶ 66.)

On a quarterly basis, Winkfein and Malcolm, two senior Livent controllers, produced a general ledger showing financial results for that quarter and once a year for year end. They provided the information to Eckstein, and in 1997, to another senior controller, Christopher Craib ("Craib"), who then put the information into an easily understood summary format for Drabinsky, Gottlieb, Eckstein, and Topol. Those persons (and later Messina) then met to review the results. (*Id.* ¶ 67.)

During these meetings, the group discussed the manipulations and agreed on the approximate nature and quantity of adjustments to be made to the Company's books, records and accounts in order to achieve the desired results. In general, Drabinsky directed that certain adjustments be made and Eckstein made notes of the adjustments. Eckstein then communicated the adjustments to Winkfein and Malcolm and instructed them to effect the adjustments in such a manner as to give them the appearance of original entries in Livent's accounting system, so that they could not be detected. Starting in approximately 1996, Malcolm also communicated the transfers to fixed asset accounts to Fiorino, Livent's theatre controller, who effected the adjustments by concealing them in dummy theatre cost accounts. (*Id.* ¶ 68.)

After the adjustments were processed, Winkfein or Malcolm provided Eckstein with an adjusted general ledger containing the accounting manipulations. Drabinsky, Gottlieb, Topol and Eckstein then met again to review the manipulated results. Drabinsky would direct any further adjustments, which Winkfein or Malcolm processed in the accounting system, at Eckstein's direction. After a final review by senior management, these bogus numbers were presented to Livent's Audit Committee, the auditors, investors and were eventually filed with the SEC. (*Id.* ¶ 69.)

Because of the magnitude and dollar amount of the manipulations, it became necessary for senior management to be able to track both the real and the phony numbers. At Eckstein's direction, Malcolm maintained computer files of the manipulations that tracked the details of expense capitalizations, expense rolls and show-to-show cost transfers from 1995 through the first quarter of 1998. Eckstein directed that these records be kept, and he showed them to Drabinsky to be certain that Drabinsky knew exactly what manipulations had been implemented. Fiorino also separately tracked the costs that had been improperly transferred to theatre construction accounts by creating a numerical range of accounts in the general ledger in which he recorded the transferred amounts so that he could measure the true costs of Livent's theatre construction. (*Id.* ¶ 70.)

In addition, commencing in approximately mid–1997, Eckstein directed Craib, who joined Livent from D & T in June 1997, to prepare quarterly schedules containing a comparison of actual and budgeted results. These schedules showed items such as the "expense roll" and the "amortization roll," which quantified certain of the accounting manipulations. Drabinsky, Gottlieb, Topol, Eckstein, and Messina reviewed these schedules during their meetings to discuss the manipulations. Commencing in at least October 1997, Messina also prepared pre- and post-adjustment charts that reflected transferred amounts in detail, which she distributed to Drabinsky, Gottlieb, Eckstein, and Topol for their meetings. (*Id.* ¶ 71.)

After the periodic meetings with Drabinsky, Gottlieb, and Topol, Eckstein met with Winkfein and Malcolm and provided them with the approximate dollar adjustments that they were required to make to various accounts in the balance sheet and income statement, including expense categories, specific shows and fixed asset accounts. Winkfein and Malcolm, with assistance from Fiorino for transfers to fixed assets, then processed the adjustments. (*Id.* ¶ 72.)

To make the adjustments, Malcolm identified individual invoices to alter in order to achieve the overall level of adjustments specified by Eckstein. Then, on an invoice-by-invoice basis, he and Winkfein changed the distribution dates or account codes of the selected invoices, deleted the original entries from the Company's computerized general ledger system, and reposted the fraudulent information to the general ledger. This process had the effect of making the adjusted figures appear as original transaction figures. (*Id.* ¶ 73.)

The amount and magnitude of the fraud grew so great that it was not possible simply to make the changes and adjustments via journal entries in Livent's general Ledger. As a result, beginning in approximately 1994, Eckstein had Malcolm enlist the assistance of the manager of Livent's information services department to write a computer program that would enable the accounting staff to override the accounting system without a paper or transaction trail. The information services manager then wrote programs to enable the accounting staff to execute changes on a batch, or volume, basis. (*Id.* ¶ 74.)

The Complaint alleges that the magnitude of the adjustments was large enough to have been detected in a proper audit. (*Id.* ¶ 76.)

### C. The Undisclosed Kickbacks

Beginning in 1990 and continuing through 1994, Drabinsky and Gottlieb allegedly operated a kickback scheme with two Livent vendors. Drabinsky and Gottlieb directed Eckstein to improperly capitalize the payments to the vendors, approximately $4 million, into preproduction costs. As a result, Livent's fiscal 1994, 1995 and 1996 financial statements, which reported preproduction costs of $28 million, $55.4 million and $75.6 million, respectively, were overstated by approximately $4 million in each year. (*Id.* ¶¶ 77–78.)

### D. Other Fraudulent Conduct

#### 1. Materially False and Misleading Statements to Analysts

Commencing by at least the second quarter of 1995, Drabinsky, Gottlieb, and Topol regularly provided false financial information to Wall Street analysts, including projections of future performance predicated on false data. Livent also engaged in quarterly conference calls with analysts and other interested parties, in which Drabinsky, Gottlieb, and Topol were the main speakers and made materially false and misleading representations concerning the Company's financial results. On the basis of these representations, and the Company's reported financial results, Furman Selz issued buy recommendations for Livent stock in 1997 and 1998, and Cowen & Co. issued strong buy recommendations in 1996, 1997 and 1998. Also

based on the Company's reported financials, PaineWebber Inc. issued buy recommendations in 1996, 1997 and 1998. (*Id.* ¶ 79.)

### 2. *Livent's Fraudulent Ticket Purchases*

From September 1997 through December 1997, Livent senior management arranged for Peter Kofman and Roy Wayment (the two vendors involved in the kickback scheme) to purchase tickets for Livent's Los Angeles production of "Ragtime" in order to inflate ticket sales reported to Variety magazine. This fraud was significant because if weekly ticket sales fell below $500,000, Livent's Los Angeles landlord, the Schubert Theatre, could evict the Company pursuant to a clause in their lease contract. Since Livent planned to open "Ragtime" on Broadway in January 1998, poor sales in Los Angeles would have undermined its planned opening, and an eviction would have been devastating. Since management was counting on "Ragtime" to turn the financial fortunes of the Company around, it was imperative to portray the Los Angeles production of "Ragtime" as financially successful. (*Id.* ¶ 80.)

From September 30, 1997 to December 31, 1997, Kofman purchased tickets totaling U.S. $381,015 from the box office at the Schubert Theatre in Los Angeles. Kofman made these purchases using Kofman's personal credit card or through personal checks or checks issued from one of his companies. Livent then reimbursed Kofman or his companies. In November 1997, Eckstein also enlisted Wayment to purchase tickets to the Los Angeles production of "Ragtime." Eckstein instructed Wayment to write checks to the Schubert Theatre for tickets. Livent then reimbursed Wayment's construction company, Execway. (*Id.* ¶ 81.)

Eckstein directed the Livent accounting staff to improperly capitalize these ticket purchases in Livent's fixed asset accounts. As a result, Livent's fixed asset accounts were false and misleading. Moreover, the box office numbers reported by Livent to Variety were materially false and misleading, designed to convey the false impression that "Ragtime" was a successful engagement in Los Angeles. (*Id.* ¶ 82.)

Finally, the Complaint alleges that D & T failed to exercise due professional care in the performance of its audit of Livent's financial statements. D & T failed to adhere, in numerous instances, to professional standards by: (1) opining that the financial statements were presented in conformity with GAAP, when they were not; (2) inadequately planning and supervising its audit; (3) failing to sufficiently understand Livent's internal control structure; (4) failing to obtain sufficient competent evidential matter; and (5) improperly issuing unqualified audit reports.

### *Discussion*

### I. *The Forum Non Conveniens Motions Are Denied*

Since jurisdictional statutes are drawn with a "necessary generality," often giving plaintiffs more than one choice of forum, "the open door may admit those who seek not simply justice but perhaps justice blended with some harassment. A plaintiff sometimes is under temptation to resort to a strategy of forcing the trial at a most inconvenient place for an adversary, even at some inconvenience to himself." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). To thwart such mischief, the doctrine of *forum non conveniens* was developed, permitting a court to dismiss an action and transfer it to, or enable it to be re-filed in, a more convenient forum. *See Canada Malting Co. v. Paterson Steamships,* 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837 (1932).

■ The doctrine of *forum non conveniens* "leaves much to the discretion of the court to which plaintiff resorts." *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839. "[D]ismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the

court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

■ There are two steps to resolving a *forum non conveniens* motion. *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir.1996). First, the court must determine whether an adequate alternative forum is available. *See id.; Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 981 (2d Cir.1993). If an adequate alternative forum is available, the court must then consider the relevant "private" and "public" interest factors and determine whether "the balance of convenience tilts strongly in favor of trial in the foreign forum." *R. Maganlal & Co. v. M.G. Chem. Co., Inc.*, 942 F.2d 164, 167 (2d Cir.1991).

### A. Adequate Alternative Forum

The parties have vigorously disputed whether Ontario, Canada is an adequate alternative forum. The inquiry hinges on complex questions of class certification for a securities action and the availability of causes of action under Canadian statutory and common law. The parties have obtained the affidavits of several experts, including a leading member of the Ontario bar well-versed in securities litigation, a former Justice of the Canadian Supreme Court, and three professors of law at the University of Toronto. Predictably, these experts strongly disagree on whether Plaintiffs would stand any chance of recov-

ery were they to be dismissed from this Court and forced to re-file these actions in Ontario. Fortunately, however, this Court need not decide the question of the adequacy of the Ontario forum, because the public and private interest factors, weighed together, do not favor dismissal.[3]

### B. Private and Public Interest Factors

If, for purposes of this analysis only, an adequate alternative forum is deemed to exist, the next step is to consider the relevant "private" and "public" interest factors listed in *Gilbert* and determine whether "the balance of convenience tilts strongly in favor of trial in the foreign forum." *Maganlal*, 942 F.2d at 167.

#### 1. Private Interest Factors

■ The "private interest factors" include the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing witnesses; the enforceability of a judgment; the possibility of viewing premises; and "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 508, 67 S.Ct. 839.

■ The private interest factors slightly favor adjudication in Ontario. Most party witnesses and many non-party witnesses are likely to be located in Canada. Some of these witnesses may be unwilling to come to New York to testify, and are

---

3. That said, the very uncertainty of the adequacy of the Canadian forum weighs against dismissal. The Defendants place great reliance on *In re Philip Services Corp. Securities Litigation*, 49 F.Supp.2d 629 (S.D.N.Y.1999), in which the Honorable Michael B. Mukasey dismissed a securities class action on *forum non conveniens* grounds. Judge Mukasey determined that Canada was both an adequate forum and that the public and private interest factors favored adjudication there. The decision, however, relied on the opinions of different experts than those retained by the parties in the instant case. Moreover, plaintiffs' ex-

perts in *Philip Services* did not contest the applicability of each and every cause of action, as Plaintiffs' experts do here.

In addition, there is no mention in *Philip Services*, nor is this Court aware, of any criminal proceedings or SEC civil proceedings initiated in the United States against any of the individual defendants in *Philip Services* arising out of the transactions in that case. Furthermore, a private securities class action had already been filed in Canada arising out of the *Philip Services* transactions, which is not the case here.

beyond the subpoena power of this Court. Moreover, much of the documentary evidence is likely to be located in Canada.

On the other hand, current computer technology, in which documents can be scanned and placed on a secure website for viewing by counsel for the parties and by the court, makes the documentary evidence factor far less important than it might have been in the past. Moreover, Livent's U.S. headquarters, a potential source of documentary evidence, is located here in Manhattan. A number of potentially important witnesses are located here as well. Letters rogatory are available to obtain the depositions of non-party witnesses unwilling to come to New York to testify, and such depositions can be videotaped to preserve the ability of the trier of fact to weigh the credibility of the witnesses, which is potentially important where, as here, fraud and subjective intent are elements of the claim. Finally, Defendants do not dispute Plaintiffs' expert's affidavit that any judgment rendered by this Court will be enforceable in Canada. These facts do not tip the balance of the private interest factors in favor of retaining the action in New York. However, taken together, the private interest factors only slightly favor adjudication in Canada.

### 2. *Public Interest Factors*

■ The "public interest factors" include the interest in avoiding administrative difficulties arising from court congestion; the interest in avoiding the unfair imposition of jury duty on citizens of an unrelated forum; the "local interest in having localized controversies decided at home"; the interest in having a diversity case tried in a forum that is at home with the law governing the case, the interest in avoiding unnecessary problems with the conflict of law, or the application of foreign laws; and the interest "[i]n cases which touch the affairs of many persons" in insuring that such individuals will have access to the trial. *Gilbert,* 330 U.S. at 508–09, 67 S.Ct. 839.

The public interest factors strongly favor retention of the action in New York. First, it is quite clear from the numerous criminal indictments handed down in this District against Drabinsky and Gottlieb, and from the related SEC civil action, that the Government of the United States considers the alleged violations that form the basis of this action to be an important local and national concern. The regulatory regime created by Congress to foster efficient and transparent capital markets in the United States envisioned a combination of criminal penalties, SEC and other public civil proceedings, and private civil remedies to ensure adherence to the regime and provide relief for victims of its transgressors. As noted above, trading in Livent on NASDAQ far exceeded trading on the Toronto Exchange. There is, unquestionably, a strong local and national interest in enforcing the securities laws of this country in order to maintain the integrity of the markets. *See Alfadda v. Fenn,* 159 F.3d 41, 47 (2d Cir.1998); *Derensis v. Coopers & Lybrand,* 930 F.Supp. 1003, 1011 (D.N.J.1996); *Trafton v. Deacon Barclays de Zoete Wedd Ltd.,* No. C 93–2758 FMS, 1994 WL 746199 (Oct. 21, 1994).

Moreover, if this action were to be adjudicated in Canada, it is not clear whether the Canadian courts would apply United States securities laws at all. If they did, they would not, of course, have the familiarity with those laws that courts of this District, located within walking distance of Wall Street, have obtained through the continuous adjudication of securities litigation.

Additionally, Livent has extensive business dealings in the United States, and, in particular, in New York City, where it is a major presence on Broadway. It has also received substantial tax subsidies from the City. Its productions have won numerous Tony Awards, which are likely to add considerable value to the productions. Jury duty will not be an unfair imposition on New Yorkers.

Docket congestion is likely to be greater in this District than in Ontario, yet, as the discussion above indicates, the class action procedure is relatively undeveloped in Ontario and proceedings might progress at a far slower rate. Taken together, the public interest factors weigh strongly against dismissal.

### 3. Weighing the Private and Public Interest Factors Together

Because the "strong presumption in favor of the plaintiff's choice of forum . . . may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum," *Reyno*, 454 U.S. at 255, 102 S.Ct. 252, dismissal on the grounds of *forum non conveniens* is the exception, not the rule. *See Gilbert*, 330 U.S. at 504, 67 S.Ct. 839; *Maganlal*, 942 F.2d at 168. However, this presumption is entitled to less weight where, as here, plaintiffs proceed in a representative capacity. *See, e.g., Koster v. (American) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947).

In any event, the balance of factors clearly weighs against dismissal. While the private interest factors, as noted, slightly favor adjudication in Canada, the public interest factors strongly favor adjudication in New York. It would be incongruous, indeed, if the criminal action and the SEC civil action proceeded in this District while the private civil action was dismissed on *forum non conveniens* grounds. The motions are therefore denied.

### II. The Motions To Dismiss

In reviewing a motion to dismiss under Rules 9(b) or 12(b)(6), a court must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993) (*citing IUE AFL—CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993)). Dismissal is warranted only when

"the plaintiff cannot recover on the facts he has alleged." *Id.*

Plaintiffs in this action have alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5, 17 C.F.R. 240.10b–5, promulgated thereunder.

### A. The 10(b) and 10b–5 Causes of Action

Section 10(b) provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b–5 "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Press v. Chemical Inv. Services Corp.*, 166 F.3d 529, 534 (2d Cir.1999). Under Rule 10b–5,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. 240.10b–5 (1999).

■ As interpreted by this Circuit, to state a claim for relief under Section 10(b) and Rule 10b–5, Plaintiffs must allege that each defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re IBM Corp. Securities Litigation*, 163 F.3d 102, 106 (2d Cir.1998).

It is not disputed in the instant motions that misstatements or omissions were made with respect to the SEC filings during the fiscal years 1995, 1996, and 1997, and the first quarter of 1998; that Plaintiffs relied on such misstatements or omissions; and that such reliance was the proximate cause of their injury.[4] Defendants, however, contend to varying degrees that: (1) the facts alleging fraud with respect to each defendant have not been pled with sufficient particularity; and (2) more specifically, the standard for pleading scienter has not been met.

### Pleading Fraud With Particularity

Rule 9(b) requires that in all allegations of fraud the circumstances constituting the fraud must be "stated with particularity." Fed.R.Civ.P. 9(b); *see Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994). The concerns animating Rule 9(b) are (1) to provide a defendant with fair notice of the claims against it; (2) to protect a defendant from harm to its repu-

tation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). The Private Securities Litigation Reform Act of 1995 (the "PSLRA") further requires, in 10(b) or 10b–5 actions, that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." PSLRA § 21D(b)(1), 15 U.S.C. § 78u–4(b)(1).

The Second Circuit has required that allegations of fraud adequately specify the statements made that were false or misleading, give particulars as to the respect in which it is contended that the statements were fraudulent, and state the time and place the statements were made and the identity of the person who made them. *See McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir.1992); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989).

■ The pleading must also give notice to each opposing party of its alleged misconduct. Thus, a claim may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be appraised of the circumstances surrounding the fraudulent conduct with which he individually stands charged. *See Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 518, 522 n. 7 (S.D.N.Y. 1977). This requirement facilitates the preparation of an adequate defense while

---

4. Reliance is posited on the "fraud on the market" theory, which is

> based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements....

> The causal connection between the defendant's, fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentation.

> *Basic Inc. v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (*quoting Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir.1986)).

protecting a party's reputation from groundless accusations. *See de Atucha v. Hunt,* 128 F.R.D. 187, 189 (S.D.N.Y.1989), *aff'd,* 979 F.2d 846 (2d Cir.1992); *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 768 (S.D.N.Y.1981), *aff'd,* 697 F.2d 296 (2d Cir. 1982). It also serves to prevent abuse of process and gratuitous disruption of normal business activity. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 740–41, 95 S.Ct. 1917, 1927–28, 44 L.Ed.2d 539 (1975).

### Pleading Scienter

 Not all elements of a fraud claim need be pleaded with equal particularity, however. Rule 9(b) provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *See Shields,* 25 F.3d at 1128. In particular, "allegations of scienter ... are not subjected to the more exacting consideration applied to the other components of fraud." *Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 143 (2d Cir.1991) (*quoting Ouaknine v. MacFarlane,* 897 F.2d 75, 81 (2d Cir.1990)); *accord Press,* 166 F.3d at 538 ("The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences."). All that is required under Rule 9(b) is that there exist a "minimal factual basis for ... conclusory allegations of scienter." *Cohen v. Koenig,* 25 F.3d 1168, 1173 (2d Cir.1994) (*quoting Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987)). "In fact, conclusory allegations of scienter are sufficient 'if supported by facts giving rise to a "strong inference" of fraudulent intent.'" *IUE AFL—CIO Pension Fund,* 9 F.3d at 1057 (*quoting Ouaknine,* 897

F.2d at 80). There are two methods of pleading that may give rise to such an inference. Plaintiffs must either "(a) allege facts to show that defendants had both motive and opportunity to commit fraud; or (b) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Press,* 166 F.3d at 537–38.[5]

### 1. The Motions to Dismiss of Drabinsky, Gottlieb, Topol, and Messina Are Denied

Individual defendants Drabinsky, Gottlieb, Topol, and Messina maintain that the Complaint fails to plead scienter with the requisite specificity for each of them, by failing to plead either (1) motive and opportunity, or (2) strong circumstantial evidence of conscious misbehavior or recklessness, or to allege adequately the sources of the information in the Complaint. The issue of motive and opportunity need not be addressed. Plaintiffs meet the pleading standards for facts constituting strong circumstantial evidence of conscious misbehavior and have adequately alleged their sources of information.

 As recounted above, Drabinsky is specifically alleged to have "orchestrated" the fraudulent revenue generating transactions with Pace, American Artists, Wood Gundy, Dundee, and Dewlim, (Compl.¶¶ 31–56), to have had specific knowledge of the Put Agreement with Dundee and of Gottlieb's misrepresentation of its cancellation to the Board, (*id.* ¶¶ 46, 50), and to have promised to repay the money advanced by Dewlim (*id.* ¶ 53). He is also alleged to have directed an extensive manipulation of Livent's books,

---

5. *Press* appears to have laid to rest, at least for the immediate future, the question of whether the PSLRA merely codified the Second Circuit's case law interpreting the pleading standards for scienter, or abrogated that law, either by eliminating the "motive and opportunity" prong, or the recklessness aspect of the "strong circumstantial evidence" prong, or both. *See, e.g., Norwood Venture Corp. v. Converse Inc.,* 959 F.Supp. 205, 208 &

n. 5 (S.D.N.Y.1997); *In re Health Management, Inc. Securities Litigation,* 970 F.Supp. 192 (E.D.N.Y.1997); *In re Baesa Securities Litigation,* 969 F.Supp. 238, 242 & n. 2 (S.D.N.Y.1997). *Press* affirms that both the "motive and opportunity" test and the recklessness prong of the "strong circumstantial evidence" test still stand. *See Press,* 166 F.3d at 538.

by shifting costs and erasing entries from the general ledger, and by holding regular meetings with senior staff to review the adjustments to be made. (*Id.* ¶¶ 57–76.) Furthermore, he is alleged to have accepted kickbacks from vendors (*id.* ¶¶ 77–78), and to have provided false information to Wall Street analysts (*id.* ¶ 79).

Gottlieb is specifically alleged to have orchestrated the fraudulent revenue generating transactions along with Drabinsky (*id.* ¶ 31), to have negotiated the Wood Gundy contract and the side letters (*id.* ¶¶ 41–42) and to have asked Wood Gundy not to disclose the side agreements to Livent's new management in 1998 (*id.* ¶ 43), to have misrepresented to the Board that the Put Agreement with Dundee had been cancelled when it was still in place (*id.* ¶¶ 48–49), and to have negotiated the Dewlim transaction (*id.* ¶¶ 52–54). He is alleged to have played the same supervisory role in the manipulation of Livent's books as that played by Drabinsky as outlined above, (*id.* ¶¶ 57–76), to have received vendor kickbacks (*id.* ¶¶ 77–78), and to have provided false information to Wall Street analysts (*id.* ¶ 79).

Topol is specifically alleged to have signed the American Artists side letters (*id.* ¶ 39), to have reviewed the accounting manipulations with Drabinsky and Gottlieb (*id.* ¶¶ 67, 69, 71), and to have made false statements to analysts (*id.* ¶ 79).

Messina is specifically alleged to have participated in the reviews of the accounting manipulations with Drabinsky and Gottlieb. (*Id.* ¶¶ 67, 71).

These allegations of facts unquestionably constitute strong circumstantial evidence of conscious misbehavior. The Insider Defendants repeatedly assert, with respect to discrete allegations in the Complaint regarding the various fraudulent schemes, that the Complaint fails to plead that each Insider Defendant "knew" of the existence of the particular schemes or "knew" of the effect such schemes would have on the financial statements and thereby on the quarterly and annual reports filed with the SEC. The previous paragraph, however, identifies precisely where in the Complaint such allegations of knowledge are pled. Moreover, Plaintiffs are not required to plead that Defendants' knowledge of these transactions would lead to misrepresentation of Livent's financials. *See In re Health Management,* 970 F.Supp. at 204 ("[T]he Court is unaware of any legal precedent requiring that [actual knowledge of the implications of the fraud on particular statements in the SEC filings] are necessary to plead scienter … and … the Court declines to adopt such a standard.").

A strong inference of scienter is further supported by the fact that the Company's false annual and quarterly reports were signed by Drabinsky and Gottlieb, and by the magnitude of the fraud, *see In re Leslie Fay Companies, Inc. Securities Litigation,* 835 F.Supp. 167, 175 (S.D.N.Y. 1993) ("[a]lleged fraud of this magnitude, coupled with plaintiffs' other allegations, creates an implication of recklessness, on the face of the pleading, which compels us to deny defendant's motion").

The Insider Defendants counter that "Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Chill v. General Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996). But, as noted, Plaintiffs here have alleged far more than a GAAP violation; they have alleged a series of deliberate acts—and knowledge of such acts—designed to deceive the public. *Chill* is distinguished by its facts. In *Chill,* a broker for Kidder, Peabody & Co., a subsidiary of General Electric ("GE"), created a "scheme to generate false profits in order to increase his … bonuses." *Id.* at 265. The false profits caused Kidder to appear profitable in years when it was actually suffering losses. The scheme was "designed to be hidden from Kidder's management and auditors." *Id.*

When Kidder discovered the scheme, it informed GE and fired the broker. *See id.* GE in turn reshuffled top management at Kidder and conducted an internal investigation. *See id.* The complaints against GE alleged that the company had knowingly or recklessly recorded as profitable transactions that were fictitious. *See id.* at 266. In affirming the district court's dismissal of the claims against GE, the Second Circuit reasoned that GE was not reckless not to have assumed that the record profits of the bond traders indicated that a fraudulent scheme was afoot. *See id.* at 271.

The Insider Defendants are not alleged here to have failed simply to recognize the "red flags" indicating fraudulent activity; Drabinsky and Gottlieb are alleged to have orchestrated the fraud in general and to have personally carried out many of its specifics. Topol and Messina are alleged to have participated in carrying it out with knowledge of its impropriety. The positions of Drabinsky, Gottlieb, Topol, and Messina here are analogous to that of the bond trader in *Chill,* not to that of GE. *See also In re Health Management,* 970 F.Supp. at 204.

Finally, the Insider Defendants, relying on *Novak v. Kasaks,* 26 F.Supp.2d 658, 660 (S.D.N.Y.1998), maintain that Plaintiffs have failed to allege adequately the sources of information in the Complaint. This claim is baseless. "The Second Circuit ... has held that '[d]espite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge....'" *Vento & Co. of New York. LLC v. Metromedia Fiber Network, Inc.,* 1999 WL 147732, No. 97 Civ. 7751(JGK), 1999 WL 147732, at *7 (*quoting Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990); *see also In re Health Management Systems, Inc. Securities Litigation,* 97 Civ. 1865, 1998 WL 283286, at *3 (S.D.N.Y. June 1, 1998)). It is also apparent that much of the Com-

plaint is culled from Livent's SEC filings and the SEC complaint in the separate civil action against several of the Individual Defendants. These sources, and others, are acknowledged in Paragraph 211 of the Complaint, which sufficiently alleges Plaintiffs' sources of information.

For these reasons, the motions to dismiss of Defendants Drabinsky, Gottlieb, Topol, and Messina are denied.

### 2. *D & T's Motion To Dismiss Is Granted*

D & T moves to dismiss for failure to plead scienter and to plead fraud with particularity.

#### a. *Scienter Is Not Adequately Pled*

Plaintiffs do not contest D & T's claim that the Complaint does not allege motive and opportunity on the part of D & T. On the basis of settled law in this Circuit, *see, e.g., Chill,* 101 F.3d at 268; *Aquino v. Trupin,* 833 F.Supp. 336, 341 (S.D.N.Y. 1993), this Court independently agrees. Thus, the only issue is whether Plaintiffs have alleged circumstantial evidence of conscious misbehavior or recklessness.

Plaintiffs claim to have pled specific factual allegations permitting the inference that D & T was aware of the fraudulent scheme, or at best reckless in ignoring the indicators of fraud. These allegations are: (1) the magnitude of the restatement; (2) the economic irrationality of the five fraudulent revenue generating transactions; (3) the "obvious" paper trail left by the transfer of incurred expenses from closed shows to ongoing shows. Actions taken by the Insider Defendants to hide other, independent forms of fraud do not, Plaintiffs claim, diminish D & T's liability on the basis of these allegations.

#### (1) *The Magnitude of the Fraud*

"[W]hen tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover his client's fraud raises an infer-

ence of scienter on the face of the pleading." *Leslie Fay*, 835 F.Supp. at 175. On this basis alone, Plaintiffs maintain they have met the pleading burden for scienter. Defendants maintain, on the contrary, that the magnitude of the fraud by itself cannot suffice; it must be accompanied by other factors. *See, e.g., In re Health Management*, 970 F.Supp. at 203 (magnitude of fraud, coupled with other factors, sufficient to allege scienter against outside auditor). There is no controlling authority on the question in this Circuit, and a paucity of decisions elsewhere. *See, e.g., DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir.1990); *Reiger v. Altris Software, Inc.*, No. 98–CV–528, 1999 WL 540893, at *8 (S.D.Cal. Apr. 30, 1999); *Rehm v. Eagle Finance Corp.*, 954 F.Supp. 1246, 1256 (N.D.Ill.1997).

It does not seem reasonable to infer recklessness on the part of an auditor solely from the magnitude of a fraud, particularly where, as here, the Complaint and the SEC complaint describe in detail how the magnitude of the fraud was accompanied by the thoroughness of its concealment. On the other hand, it would be a mistake to ignore the magnitude of the fraud entirely. Common sense suggests that, all other things being equal, more opportunities should exist to discover a larger fraud than a smaller fraud, especially where, as here, the magnitude of the fraud was not accomplished by one fraudulent transaction of enormous monetary significance, but by countless small adjustments to the accounting entries on the productions, several sizable loans concealed as sales of production rights, and the other manipulations described in the Complaint. Added together, of course, these manipulations were allegedly significant enough to cause the bankruptcy of the Company. Thus, the magnitude of the alleged fraud will be considered in weighing whether the Complaint meets the pleading standard for scienter.

Although the magnitude of the fraud alone cannot suffice to impute the requisite

inference of knowledge or recklessness to D & T, it does raise questions regarding D & T's performance of its audits during the relevant years. For example, if D & T was aware that the Company's management information systems were capable of manipulating the accounts without leaving a paper trail, and failed, despite this awareness, to take steps to insure that such manipulations were not being performed, this might constitute recklessness sufficient to infer scienter.

**(2) *Certification of False Financial Statements Based on Economically Irrational Transactions***

Plaintiffs' next basis for alleging recklessness is D & T's certification of false financial statements dependent on the "economically irrational transactions." Plaintiffs allege that D & T should have been suspicious of the transactions, because on their face the transactions made no economic sense from the standpoint of Pace, American Artists, Wood Gundy, Dundee, and Dewlim. In addition, D & T is alleged to have been aware that the Dundee transaction was with a related party, which was not disclosed in the financial statements. Finally, D & T allegedly should have been suspicious when it discovered the Put Agreement. Failure to further investigate these transactions, according to Plaintiffs, constitutes strong circumstantial evidence of recklessness on the part of D & T.

However, the Complaint itself, as well as the SEC complaint, alleges that Livent's insiders went to considerable lengths to conceal the truth of these transactions from D & T, including by making express representations and providing a letter from Dundee's chairman that the Put Agreement had been canceled, by actively concealing the side letters from the auditors, and by Gottlieb stating to D & T that Dewlim was not a related party (SEC

Compl. ¶ 63).[6] As for the purported economic irrationality of the transactions, at worst it is an allegation of D & T's negligence, not recklessness. "Even if [the auditor] should have done more to attempt to uncover and disclose the alleged fraud, without factual allegations tending to establish knowledge of those practices on [the auditor's] part," an auditor's failure to do more is "legally insufficient." *The Limited, Inc. v. McCrory Corp.*, 683 F.Supp. 387, 394 (S.D.N.Y.1988); *see also Schick v. Ernst & Young*, 808 F.Supp. 1097 (S.D.N.Y.1992).

### (3) *Certification of False Financial Statements Despite Availability of Documentary Evidence*

■■■ Lastly, Plaintiffs allege that the ongoing practice of transferring expenses from shows that had closed to shows that remained open should have been noticed by any auditor. Comparison of projected costs and actual costs written off when a show closed would have flagged a discrepancy.

D & T maintains that the auditors could not have discovered the fraud in the manner alleged because of the computer program permitting the staff to override the accounting system without a paper or transaction trail. This conclusion is supported by the SEC complaint, which avers that Livent's insiders did not leave a trail of red flags for D & T to discover, (SEC

Compl. ¶ 41), and actively concealed from the auditors the documents tracking the manipulations. Oversight of the alleged discrepancy, if proven, would constitute negligence.

Once again, these allegations simply do not rise to the level of recklessness defined in the case law of this Circuit. Plaintiffs have not alleged particular facts suggesting a strong inference of scienter. As indicated above, had Plaintiffs uncovered facts suggesting, for example, that D & T had knowledge of the capability of the computer system to delete entries in the general ledger without leaving a trace, and that D & T failed to make sufficient inquiries to insure that such manipulations were not taking place, allegations to that effect, coupled with the allegations already stated, could potentially satisfy the scienter requirement at the pleading stage.

As the Complaint now stands, however, Plaintiffs have not alleged scienter under the standards required by Rule 9(b) and the PSLRA, and the claim against D & T will be dismissed without prejudice to Plaintiffs to replead.

### 3. *The Motions To Dismiss of Emerson, Goldfarb, and Taubman Are Granted*

Defendants Emerson, Goldfarb, and Taubman (the "Outside Directors") also move to dismiss pursuant to Rule 9(b), on the grounds that Plaintiffs (a) fail to plead

6. In support of their motions, D & T and the Outside Directors cite to material not explicitly contained in the Complaint but in public documents referred to in the Complaint. "According to the emerging rule in this Circuit, a district court may consider the full text of a document partially quoted in the complaint where ... Plaintiffs have notice of the document's contents and the document is integral in drafting the complaint." *Bartley v. Artuz*, No. 95 Civ. 10161(DAB), 1999 WL 942425 at *4 (Oct. 19, 1999) (*citing San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 808–09 (2d Cir.1996) (recognizing the "somewhat uneven course" of Circuit case law and crediting more recent case law with permitting consideration of the full text of partially quoted documents in limited circumstances)); *see also In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 58 (2d Cir. 1998). Plaintiffs have notice of Livent's SEC filings, the SEC complaint, and the indictment by the U.S. Attorney's Office in the Southern District of New York, and have relied on those documents extensively; therefore, those materials will be considered here. Certain other materials, while cited in the Complaint, have not been extensively relied upon by the Plaintiffs and will not be considered, e.g., the contracts evidencing the five fraudulent revenue generating transactions or declarations addressing the purported economic irrationality of the production rights contracts with Pace, American Artists, Wood Gundy, and Dewlim.

fraud with particularity, and (b) fail to plead scienter.

### a. *Fraud Is Pled with Sufficient Particularity*

 The Outside Directors maintain, first, that Plaintiffs have failed to meet the particularity requirement with respect to pleading fraud. In contrast to the specificity of the allegations with regard to the Insider Defendants, the Complaint mentions Emerson and Taubman in only three paragraphs and Goldfarb in only seven. The Audit Committee is mentioned in only seven. It is also maintained that the Complaint does not make specific allegations of wrongdoing by the Outside Directors.

Plaintiffs contend, however, that the Complaint meets the particularity requirement by alleging that the Outside Directors, as members of the Audit Committee, were responsible for reviewing Livent's reporting procedures, internal controls, and management information systems, and the performance of D & T, and primarily responsible for reviewing the unaudited quarterly financials. The Complaint also alleges that the Outside Directors failed to investigate, or ignored, the "red flags" signaling the fraud.

Plaintiffs also rely on the "group pleading" doctrine, which permits a plaintiff to allege that misstatements contained in company documents may be presumed to be the work of the company's officers and directors. *See, e.g., DiVittorio,* 822 F.2d at 1247; *In re Health Management,* 970 F.Supp. at 208–09. The Outside Directors maintain that the group pleading doctrine is no longer good law in light of the PSLRA. However, this position was considered and rejected in *In re Oxford Health Plans, Inc. Securities Litigation,* 187 F.R.D. 133, 142 (S.D.N.Y.1999) ("[T]he PSLRA has not altered the group pleading doctrine ...."). *Accord Jacobs v. Coopers & Lybrand, L.L.P.,* 97 Civ. 3374(RPP), 1999 WL 101772 (March 1, 1999); *In re Health Management,* 970 F.Supp. at 209.

The position of the Outside Directors is not persuasive. There is no compelling reason not to follow the holdings in *Oxford, Jacobs,* and *Health Management.*

Plaintiffs have pled fraud with the requisite particularity. For the reasons set forth in the discussion with regard to the Insider Defendants, the various fraudulent schemes have been pled with particularity. The Outside Directors are alleged to have been reckless in not discovering such schemes and in participating in the approval and dissemination of the misstatements in the documents filed with the SEC. The particularity with which the "red flags" are alleged, combined with the group pleading doctrine, meets the 9(b) standard.

### b. *Scienter Is Not Adequately Pled*

 As with D & T, Plaintiffs do not allege motive and opportunity to meet the scienter requirement for the Outside Directors. Plaintiffs, however, seek to meet the "strong circumstantial evidence" prong by alleging: (1) that the Outside Directors, as members of the Audit Committee, were responsible for reviewing Livent's financial reporting procedures, internal controls, and management information systems, and the performance of Livent's external auditors (Compl.¶¶ 21–23); (2) that the Outside Directors were primarily responsible for reviewing the quarterly unaudited financials; (3) that there were several "red flags" which the Outside Directors failed to investigate or ignored, namely: (a) the economic irrationality of the Pace, Wood Gundy, American Artists, Dundee, and Dewlim transactions; (b) the discovery of the Put Agreement; (c) flagrant manipulation of the books by shifting costs from closed productions to running productions; and (d) Drabinsky and Gottlieb's prior history at Cineplex Odeon; (4) the magnitude of the fraud; and (5) the quick discovery of the fraud after the Lynx investment.

These allegations, however, are insufficient to plead "strong circumstantial evi-

dence." First, not once in the paragraphs of the Complaint describing the fraud are any of the Outside Directors mentioned by name. The Complaint does not allege that the Outside Directors participated in the five fraudulent revenue generating transactions. In fact, the SEC complaint alleges that such transactions were explicitly hidden from the Outside Directors by the Livent staff on orders from Drabinsky and Gottlieb, and that, with respect to the Dundee transaction, Gottlieb caused Dundee's CEO to draft a fake letter confirming the cancellation of the Put agreement. (Roth Aff.Exh. E ¶ 58). In short, Plaintiffs have not alleged facts sufficiently particular to infer that the Outside Directors had knowledge of the fraud.

Nor does the Complaint allege facts supporting a strong inference of recklessness. Reckless conduct in a 10(b) claim "represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Chill*, 101 F.3d at 269; *see Jacobs*, 1999 WL 101772, at *16 ("[J]ust because a defendant is a director and member of the company's audit committee does not lead automatically to an inference that the person acted with conscious disregard of a known risk as opposed to with gross negligence or even negligence."); *In re WRT Energy Securities Litigation*, No. 96 Civ. 3610(JFK), 1997 WL 576023, at *14 (S.D.N.Y. Sept.15, 1997). In the Complaint, the same allegations that go a long way towards satisfying the pleading requirements as to defendants Drabinsky, Gottlieb, Topol, and Messina described above—namely, the double accounting system and the meetings held in its service (Compl.¶ 68)—work against the "strong inference" that the Outside Directors would have been aware of the fraud, since the double system left no "paper or transaction trail" (Compl.¶ 74) and the Outside Directors relied on D & T to perform the audit and on the representations of management.[7] As for the Put Agreement, the Complaint describes how Gottlieb told the Outside Directors on at least two occasions that the Agreement had been cancelled. Plaintiffs make much of how D & T's discovery put the Outside Directors on notice of Gottlieb's suspicious behavior. At best, however, as the allegations of the Complaint now stand, failure to investigate further constituted negligence on the part of the Outside Directors, not recklessness.

Moreover, the "economic irrationality" of the fraudulent transactions with Pace, American Artists, Wood Gundy, Dundee, and Dewlim was not so obvious that the Outside Directors "must have been" aware of it. Their failure to investigate those transactions was, again, at the most negligent, not reckless. Additionally, the Complaint does not allege that the Outside Directors ever saw the agreements memorializing those transactions or were aware of their existence.

Furthermore, the speed with which the fraud was discovered after the Lynx investment and the change in corporate leadership is deceptive: notably, the fraud was not discovered during the due diligence of the Lynx team, and the alleged orchestrators of the fraud—Drabinsky and Gottlieb—had been removed from their managerial positions.

Finally, Plaintiffs also allege that the magnitude of the fraud suffices to meet the scienter requirement. As set forth in the discussion above regarding D & T, this allegation, by itself, is insufficient. Again, however, it does raise questions regarding

---

7. The Outside Directors point out that the Complaint, while drawing from Livent's April 16, 1997 Proxy Statement to describe the Board's and Audit Committee's functions, neglects to include the portion of the Proxy Statement that states "[T]he Board relies on the accuracy of management's production and performance related estimates," (Roth Aff., Exh. C at 8), and "[T]he Board expects that pertinent information and projections will be provided by management on a timely basis in order that the Board will be in a position to assess such information and carry out its mandate." (*Id.* at 10.)

the Audit Committee's performance, particularly with regard to whether it fulfilled its defined responsibility to review "the Company's financial reporting procedures, internal controls and management information systems and the performance of the Company's external auditors." For example, if the Outside Directors were aware that the Company's management information systems were capable of manipulating the accounts without leaving a paper trail, and failed, despite this awareness, to take steps to insure that such manipulations were not being performed, including a review of the work of D & T, this might constitute recklessness sufficient to infer scienter.

As the Complaint now stands, however, the allegations are insufficient to raise the inference of scienter necessary to survive the Outside Directors' motion to dismiss, which will be granted. Plaintiffs, however, will be given the opportunity to replead.

### B. *The Section 20(a) Claims*

The Individual Defendants have also moved to dismiss the Section 20(a) causes of action.

■■■■ Section 20(a) of the 1934 Act imposes joint and several liability on any person who "controls any person liable under any provision of this title or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). To make out a prima facie case for control person liability, "a plaintiff must show a primary violation by the controlled person[,] . . . control of the primary violator by the targeted defendant[,] . . . and . . . that the controlling person was in some meaningful sense a culpable participant in the fraud perpetuated by the controlled person." *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996) (citations omitted). Furthermore, "control over a primary violator may be established by showing that [the controller] possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract,

or otherwise.' " *Id.* (*quoting* 17 C.F.R. § 240.12b–2). Actual control is essential to control person liability. *See In re Blech Securities Litigation*, 961 F.Supp. 569, 586 (S.D.N.Y.1997) (*citing Ross v. Bolton*, 83 Civ. 8244 (WK), 1989 WL 80428, at *2 (S.D.N.Y. Apr.4, 1989) (stating that defendant must possess actual control over the transactions in question)).

#### 1. *The Outside Directors*

■■ The allegation of an underlying primary violation has been met. In order to adequately allege "control," Plaintiffs plead that by reason of membership on the Board and on the Audit Committee, the Outside Directors "were controlling persons of Livent and its employees and had the power and influence, and exercised the same, to cause Livent to engage in the illegal conduct complained of herein," (Compl.¶ 27), and "by virtue of their executive position, their knowledge of and involvement in the Company's business, and/or stock ownership, and/or power and ability to make public statements on behalf of the Company" (*Id.* ¶ 220). Additionally, Goldfarb is alleged to be a control person by virtue of being a signatory to Livent's 1997 Annual Statement.

■■■ Officer or director status alone does not constitute control. *See, e.g., Rubinstein v. Skyteller, Inc.*, 48 F.Supp.2d 315, 323 (S.D.N.Y.1999) (allegation that defendant is Treasurer and/or Chief Financial Officer of company insufficient to establish control); *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.*, 941 F.Supp. 1369, 1378 (S.D.N.Y.1996); *Hemming v. Alfin Fragrances, Inc.*, 690 F.Supp. 239, 245 (S.D.N.Y.1988). Nor does membership on an audit committee. *See, e.g., Jacobs*, 1999 WL 101772, at *17.

Courts in this District have disagreed on whether an allegation that an audit committee member signed a fraudulent SEC filing could raise a sufficient inference of control. *See Jacobs*, 1999 WL 101772, at *17 (citing cases). *Jacobs* held that "It

does comport with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report." *Id.* This Court agrees. An outside director and audit committee member who signs off on the financials can be presumed to have "the power to direct or cause the direction of the management and policies of" the corporation. 17 C.F.R. § 240.12b–2. However, as the previous discussion regarding the Outside Directors' liability for the 10(b) and 10b–5 claims indicated, the Complaint does not allege particularized facts as to the Outside Directors' "culpable participation" in the fraud. Thus, Plaintiffs do not satisfy the third requirement to allege a 20(a) claim for the Outside Directors, and the motion to dismiss will be granted.

### 2. *The Insider Defendants*

Drabinsky, Gottlieb, Topol, and Messina do not contest the 20(a) claim except insofar as a 20(a) claim requires, first, a primary violation under 10(b). Since it has been determined above that Plaintiffs have satisfied the pleading requirements for a 10(b) claim, the pleading requirements for a 20(a) claim have also been satisfied with respect to those defendants.

### III. *The Motion To Strike of Drabinsky and Gottlieb Is Denied*

Drabinsky and Gottlieb move, pursuant to Rule 12(f), to strike paragraphs 77–78 and 184–88 of the Complaint.

Rule 12(f) provides:

Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

Fed.R.Civ.P. 12(f).

The paragraphs at issue relate to the undisclosed vendor kickbacks allegedly received by Drabinsky and Gottlieb from 1990 through 1994 (Compl. ¶¶ 77–78), and to the allegedly questionable accounting practices of Drabinsky and Gottlieb during their years as the heads of Cineplex Odeon in the 1980's (*id.* ¶¶ 184–88). Drabinsky and Gottlieb claim that these allegations are unfounded, scandalous, and immaterial. It is apparent from the Complaint, however, that the allegations of the kickback scheme were made because the results allegedly affected the financial statements during the Class Period, and that the allegations of the Cineplex Odeon improprieties were made to support the allegations that D & T and the Outside Directors should have entertained heightened suspicions of the reliability of representations made by Drabinsky and Gottlieb. Thus, neither the allegations of the kickback scheme nor of the Cineplex Odeon improprieties can be said to be completely immaterial to the pleadings. Nor are the allegations particularly scandalous, when viewed alongside the litany of allegations of fraud made throughout the Complaint. The motion to strike is therefore denied.

### *Conclusion*

For the reasons set forth above, the motions to dismiss on *forum non conveniens* grounds are denied. The Rule 9(b) motions to dismiss of defendants Emerson, Taubman, Goldfarb, and D & T are granted, without prejudice to Plaintiffs to replead. The Rule 9(b) motions to dismiss of defendants Drabinsky, Gottlieb, Topol, and Messina are denied. The motion to strike of Drabinsky and Gottlieb is denied.

Settle judgment on notice.

It is so ordered.