**MAGELLAN REAL ESTATE INVESTMENT TRUST, Plaintiff,**

v.

**Kenneth K. LOSCH, et al., Defendants.**

**No. CIV99–1459–PHX–ROS.**

United States District Court, D. Arizona.

July 28, 2000.

Don P. Martin, Chesica Gilson Hall, Phoenix, AZ, for Plaintiff.

David Eric Rauch, Patricia Lee Refo, Todd Feltus, Snell & Wilmer LLP, Phoenix, AZ, for Defendants.

## ORDER

SILVER, District Judge.

In its Complaint, Plaintiff Magellan Real Estate Investment Trust ("Plaintiff" or "the REIT") alleges that the thirteen Defendants, operating under the umbrella of the Magellan corporations, mismanaged Plaintiff's properties and wrongfully drained Plaintiff's assets to fund unrelated projects and enrich themselves at the expense of Plaintiff's investors. Pending before the Court are Defendants' Motion to Dismiss on Grounds of *Forum Non Conveniens* and Motion to Dismiss the federal and Arizona RICO claims.

Prior to the hearing on June 1, 2000, Defendants filed a Supplemental Reply Memorandum in support of their Motion to Dismiss. Rather than obtaining approval in advance, Defendants requested leave to file the supplement in the text of the pleading. Plaintiff filed a Response in which it both opposed the request for leave

to supplement and addressed the contentions raised therein. Over one month later, Plaintiff also filed a Notice of Filing Supplemental Exhibit in Support of its ... Response ... without seeking this Court's leave. Because both parties have fully addressed the issues raised therein, leave to file the Supplemental Reply will be granted. The Court also will consider the Plaintiff's supplemental exhibit. However, as the Court stated at the hearing, in the future the parties should request leave to file a supplement in advance. Leave may be requested by filing a motion to which the proposed supplement is attached as an exhibit, or counsel may stipulate to the filing of the supplement with court approval.

Each party also filed a supplemental memorandum after the hearing, in accordance with this Court's instructions to file supplements addressing new arguments raised for the first time at the hearing. These supplemental memoranda were properly filed.

### Background

Plaintiff alleges that the three individual Defendants, Litwin, Losch, and Dewar, formed the Plaintiff REIT to acquire additional capital. (Compl. at ¶ 22). The individuals developed a plan to market shares in the REIT to raise capital for down payments on property and to secure financing for the balance of the property price. (*Id.*) They planned to pay investors a yearly dividend from rental income obtained by managing the property. (*Id.*) Investors were required to invest in a minimum of five trust units, and a total of 21,161 trust units were sold for gross proceeds of $21,710,540. *Id.* at ¶¶ 27, 30. A document entitled "Declaration of Trust" defines the rights, powers, and obligations of the· REIT's trustees, including Losch and Litwin, two of the individual Defendants. (*Id.* at ¶¶ 37–39).

The Declaration of Trust also recognizes three contracts between Plaintiff and Defendant Magellan REIT Management Limited Partnership ("MRLP"). (*Id.* at ¶ 41). In the first of these, the Property Management Agreement, ("PMA"), Plaintiff agreed to pay MRLP for the day-to-day management, leasing, and maintenance of Plaintiff's properties, including maintenance of accurate records and books. (*Id.* at ¶¶ 45–46, 51). In the second, the Asset Management Agreement, ("AMA"), Plaintiff agreed to pay MRLP for investment management services including review of the mix of properties, assessment of the properties' performance, and recommendations regarding which should be retained. (*Id.* at ¶¶ 58–59). In the third, the Services Agreement, ("SA"), Plaintiff agreed to pay MRLP a fee to identify and report to the Trustees additional property suitable for acquisition. (*Id.* at 65, 67). Each agreement contains a choice of law provision requiring application of the law of Ontario, Canada.

Plaintiff alleges that Defendants engaged in a variety of misconduct. Plaintiff alleges that Defendants caused it to incur unauthorized issuance costs by failing to segregate the costs of issuing and promoting Plaintiff and other investment vehicles, then charging the total costs to Plaintiff (*id.* at ¶¶ 72–73), as well as by improperly borrowing money from Plaintiff to fund other investment vehicles and then attempting to claim additional issuance costs from Plaintiff to offset the amount borrowed (*id.* at ¶ 75).

Plaintiff further alleges that Defendants made unauthorized alterations in Plaintiff's structure by using Plaintiff's capital to purchase eleven properties, six apartment complexes in California and five in Arizona, and then holding those properties in the name of partnerships in which Plaintiff was merely a limited partner. (*Id.* at ¶¶ 78–80). Plaintiff alleges that the general partners who controlled the property were companies owned and controlled by the individual Defendants or other companies under Defendants' control, and that their improper control of the properties resulted in unauthorized payments from Plaintiff's assets. (*Id.* at ¶ 84). Plaintiff

alleges that the controlling partners in the limited partnerships also developed new property management agreements governing the 11 properties referenced above, agreements materially different from the three original agreements discussed above. Plaintiff adds that, under the new agreements, it was required to pay increased management fees and other increased expenses to various Defendants. (*Id.* at ¶¶ 86–87, 95).

Plaintiff further alleges that the three individual Defendants approved payment of fees by Plaintiff to which MRLP was not entitled, including fees for years in which the minimum requirements for fee payment had not been satisfied, as well as refinancing fees not contained in the original agreements. (*Id.* at ¶¶ 96, 98). According to Plaintiff, unauthorized charges totaled more than $5 million. (*Id.* at ¶ 99).

Plaintiff also alleges that MRLP breached the three original agreements in several respects, specifically, that: (1) MRLP breached the AMA by failing to provide ongoing asset management reports to Plaintiff and charging Plaintiff several unauthorized charges; (2) MRLP breached the PMA by failing to maintain full and accurate records and books, other required accountings, operating statements, and budgets, failing to keep Plaintiff's funds separate, and charging unauthorized charges; and (3) MRLP breached the SA by failing to provide ongoing analysis and reports regarding acquisition of properties, failing to obtain approval for purchase of one of the properties, and charging unauthorized charges. (*Id.* at ¶¶ 100–102).

Plaintiff next alleges that the individual Defendants and MRLP (1) caused Plaintiff to make an unauthorized, imprudent, and unsecured loan for $ 2 million and to charge interest at a rate well below the market rate to a company with which Defendants were affiliated; (2) caused Plaintiff to transfer shares in two corporations for no or wholly inadequate consideration; and (3) that both these acts constituted willful conversion of assets for Defendants'

own benefit. (*Id.* at ¶¶ 104, 107, 115–116, 119). Finally, Plaintiff alleges that the individual Defendants and MRLP made various misrepresentations and omissions in furtherance of Defendants' wrongful acts.

## Discussion

### Motion to Dismiss on the Ground of *Forum Non Conveniens*

■ Defendants, the parties moving for dismissal on the ground of *forum non conveniens*, acknowledge that venue is not improper in Arizona, but argue that a Canadian venue would be more convenient. Defendants have the burden of establishing that: (1) an adequate alternative forum exists; and (2) the balance of relevant private and public interest factors favors dismissal. *Alpha Therapeutic Corp. v. Nippon Hoso Kyokai*, 199 F.3d 1078, 1090 (9th Cir.1999); *Creative Technology, Ltd. v. Aztech System Pte, Ltd.*, 61 F.3d 696, 699 (9th Cir.1995). Dismissal for *forum non conveniens* is an "exceptional tool to be employed sparingly." *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir.2000).

■ Generally, Plaintiff is entitled to its choice of forum absent factors weighing strongly in favor of transfer. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) (stating that "the plaintiff's choice of forum should rarely be disturbed"). In their Motion, Defendants argue that Plaintiff's choice of an Arizona forum is not entitled to deference because Plaintiff is not an Arizona resident. *See Gemini Capital Group, Inc. v. Yap Fishing Corp.*, 150 F.3d 1088, 1091 (9th Cir. 1998). However, in that action, the Ninth Circuit merely stated that the Plaintiff's choice was entitled to less deference when Plaintiff is not an Arizona resident, not that Plaintiff's choice is entitled to no deference at all. *See id.* at 1091. In a decision issued after Defendants filed their initial Motion and Reply, the Ninth Circuit expressly stated: "[L]ess deference is not the same thing as no deference." *Ravelo Monegro*, 211 F.3d at 514. At the hearing,

Defendants' counsel acknowledged that Plaintiff's choice of forum remains entitled to some deference.

■ As another preliminary matter, the Court will consider the import of the forum selection clause contained in the three agreements between Plaintiff and MRLP, a clause the parties agree is permissive, rather than mandatory. The clause provides:

> The parties hereto irrevocably attorn to the jurisdiction of the courts of the Province of Ontario to resolve any dispute which may arise among them concerning this Agreement and the subject matters hereof.

(PMA § 7.14, AMA § 5.14, SA § 7.14, Exhs. 2–4 to Compl.) At the hearing, Defendants argued that this clause, though not mandatory, is entitled to some weight as an expression of the parties' intent. However, as Plaintiff argued in its post-hearing supplement, the standard approach to the issue of *forum non conveniens* is employed when a forum selection clause is merely permissive, rather than mandatory. *See Blanco F. v. Banco Industrial de Venezuela*, 997 F.2d 974, 979–80 (2nd Cir.1993). Therefore, the permissive forum selection clause is not entitled to weight as a factor.

### I. Initial Inquiry Into Choice of Law

■ Defendants correctly state that, before dismissing a case on the ground of *forum non conveniens*, this Court must first make a choice of law determination. *Creative Technology, Ltd.*, 61 F.3d at 700 (citation omitted); *Contact Lumber Co. v. P.T. Moges Shipping Co. Ltd.*, 918 F.2d 1446, 1450 (9th Cir.1990) (quotation omitted). However, the preliminary inquiry into choice of law is performed only to determine whether the parties have chosen to apply laws that mandate venue in a particular court. *See Gemini Capital Group, Inc.*, 150 F.3d at 1092; *Creative Technology, Ltd.*, 61 F.3d at 699–700; *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 771 (9th Cir.1991) (citations omitted). For example, certain federal statutes such as the Jones Act mandate venue in United States district courts. *Creative Technology, Ltd.*, 61 F.3d at 699–700. If the parties have selected laws mandating a particular venue, the law chosen dictates the forum and the doctrine of *forum non conveniens* is inapplicable. *Id.*; *Lockman Found.*, 930 F.2d at 772.

Defendants point out that the three agreements between Plaintiff and MRLP each contain a provision selecting Ontario, Canada law for resolving contractual disputes. (Defs.' Mot at 6). Defendants do not claim that the Ontario law chosen in these provisions mandates a particular venue; as a result, the fact that Ontario, Canada substantive law was selected and may apply to some of the claims does not require that this Court grant the motion to dismiss or change venue to Ontario, Canada. The Court will proceed with the *forum non conveniens* analysis.[1]

### II. Adequate Alternative Forum

■ As stated above, the next step in a *forum non conveniens* inquiry is to determine whether an adequate alternative forum exists. Ordinarily, this requirement

---

1. The forum court's familiarity with the parties' choice of law is one of many factors that will be considered. *See Creative Technology Ltd.*, 61 F.3d at 703–704 (quotation omitted). Defendants refer to a decision in which a district court in Arizona did not limit its preliminary inquiry into choice of law to the issue of whether the law mandated a particular venue. *Carney v. Singapore Airlines*, 940 F.Supp. 1496, 1498 (D.Ariz.1996). However, though the district court immediately considered whether the choice of law favored a particular forum, it nonetheless proceeded to consider several other factors. *See id.* at 1499 (stating that "[t]he determination of which country's law applies does not end the inquiry in the forum non conveniens analysis"). This Court agrees with the court in *Carney* that choice of law is one of many factors to consider. However, as explained in the text above, a threshold inquiry into choice of law is necessary only to determine whether the law chosen mandates a particular venue.

will be satisfied if the defendants are "amenable to service of process in the alternative forum." *Creative Technology, Ltd.,* 61 F.3d at 701 (citing *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)); *Ceramic Corp. of America v. Inka Maritime Corp.,* 1 F.3d 947, 949 (9th Cir.1993) (citing same). Defendant Kenneth Losch avers that he possesses the authority to bind Defendant Magellan Development Corporation. (Losch Aff. at ¶ 3, Def.'s Exh. A). He further avers that both he and the corporation "agree to submit to the jurisdiction of the Superior Court of Ontario or the Supreme Court of British Columbia for disposition of the matters raised in this lawsuit." (*Id.* at ¶¶ 2, 4). Defendant Leslie Litwin avers that she has authority to bind the following Defendants: MRLP, Magellan REIT Management I Corporation; Magellan Residential, LLC; Magellan REIT GP Shareholder LLC; Magellan Properties LP; Magellan Galleria Palms Property LP; Magellan Galleria Palms Property I, LLC; Magellan Real Estate Investments, LLC; and Magellan Management Corporation; (Litwin Aff. at ¶¶ 3, 5, 7, 9, 11, 13, 15, 17, 19, Defs.' Exh. B). She further avers that she and each of the entities she has authority to bind agree to submit to the jurisdiction of one of the two Canadian courts referenced above. (*Id.* at ¶¶ 2, 4, 6, 8, 10, 12, 14, 16, 18, 20). The remaining Defendant, David Dewar, also avers his agreement to submit to the jurisdiction of one of these Canadian courts. (Dewar Aff., Defs.' Exh. C).

There may be "rare circumstances" in which the "remedy provided by the alternate forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Ceramic Corp.,* 1 F.3d at 949 (*quoting Piper Aircraft Co.* 454 U.S. at 254 n. 22, 102 S.Ct. 252). For example, dismissal is inappropriate when the alternate forum " 'does not permit litigation of the subject matter of the dispute.' " *Creative Technology, Ltd.,* 61 F.3d at 701 (quoting *Piper Aircraft Co.,* 454 U.S. at 254 n. 22, 102 S.Ct. 252); *Ceramic Corp.,* 1 F.3d at 949

(quoting same). However, Plaintiff does not argue that such circumstances exist in the action at bar. Because all of the Defendants have agreed to submit to the jurisdiction of one of the two Canadian courts, Defendants have established the existence of an adequate alternative forum. *See Creative Technology, Ltd.,* 61 F.3d at 701.

### III. Private and Public Interest Factors

Having determined that an adequate alternative forum exists, the Court proceeds to balance the private and public interest factors to determine whether to dismiss on grounds of *forum non conveniens. See Alpha Therapeutic Corp.,* 199 F.3d at 1092, *Creative Technology Ltd.,* 61 F.3d at 703.

#### A. Private Interest Factors

██ The private interest factors that must be balanced include:

> (1) relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses, and cost of obtaining attendance of willing witnesses; (3) possibility of viewing subject premises; [and] (4) all other factors that render trial of the case expeditious and inexpensive.

*Creative Technology Ltd.,* 61 F.3d at 703 (quoting *Zipfel v. Halliburton Co.,* 832 F.2d 1477, 1487 (9th Cir.1987) (citing *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. 839), *cert. denied,* 486 U.S. 1054, 108 S.Ct. 2819, 100 L.Ed.2d 921 (1988)). The parties focus on the location of witnesses and documentary evidence.

#### 1. Location of Witnesses

██ Plaintiff argues that the "vast majority" of witnesses are located in Arizona. (Pl.'s Resp. at 7). Defendants do not dispute that all three of the individual Defendants, though Canadian residents, currently reside in Arizona. Plaintiff also contends, and Defendants do not dispute,

that eight or nine of the ten remaining defendants, corporations and partnerships, were formed under Arizona law, and all ten have offices in Phoenix. As Plaintiff argues, "forum resident[s] should have to make a stronger case than others for dismissal based on forum non conveniens." *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602, (10th Cir.1998) (citing *Reid–Walen v. Hansen*, 933 F.2d 1390, 1395 (8th Cir. 1991)), *cert. denied*, 119 S.Ct. 1755, 526 U.S. 1112, 143 L.Ed.2d 787 (1999). The fact that Defendants reside in Arizona weighs heavily against dismissal on grounds of *forum non conveniens*. *See Reid–Walen*, 933 F.2d at 1395.

That the Arizona forum would be more convenient for the Defendants is confirmed by an affidavit filed by one of the individual Defendants, Dewar, in a British Columbia action filed by some of the Magellan entities. In that action, Dewar submitted an affidavit in support of a request that a counterclaim be dismissed and refiled in the United States. He averred:

> [Litwin and I] are in charge of the Phoenix offices.... It is difficult to have one of us out of the office for brief periods of time; to have both or either of us in Vancouver for any period of time would be disruptive to the business and place a heavier work load on those left in the office. If the matter was heard in Phoenix, coordinating our absence from the office would be easier and the corresponding difficulties caused by our absence minimized.

(Dewar Aff. at ¶ 23, attached to Pl.'s Notice of Filing Supp. Exh.) This statement is inconsistent with the Defendants' current position that convenience requires hearing the case in Canada. At the hearing on the pending motions, Defendants' counsel stated that Defendants never stated that the claims should not be litigated anywhere in Canada. However, Defendants do not suggest that Ontario, the only other Canadian location they propose, would be more convenient for them than British Columbia.

■ Plaintiff further contends that the majority of third-party witnesses are in Arizona. Defendants' former employees who may possess relevant knowledge are in Arizona. The supplemental affidavit of Plaintiff's Chairman, Ian Mallmann, lists twelve such individuals. (Mallmann Supp. Aff. at ¶ 2(a)-(g), Exh. 3 to Pl.'s Supp. Post–Hearing Mem.) In his original affidavit, Mallmann also avers that, though KPMG, Plaintiff's former accountant, is in Canada, Defendants utilized the Phoenix office of the Arthur Anderson accounting firm to complete the 1997 and 1998 consolidated balance sheet for Plaintiff and its subsidiaries. (Mallmann Aff. at ¶ 16). Plaintiff claims that Arthur Anderson's Phoenix office is familiar with the "allocated cost recoveries" and other purportedly unauthorized charges at issue in the Complaint. (*Id.*) In his supplemental affidavit, Mallmann lists twelve current or former Arthur Andersen employees who may have relevant information. (Mallmann Supp. Aff. at ¶ 2(h)-(j)).

Mallmann further avers that Defendants utilized another Phoenix accounting firm, Zolondek, Stassels, Greene & Freed, to prepare 1997 audited financial statements for Plaintiff and the eleven limited partnerships that hold the Plaintiff's properties. (Mallmann Aff. at ¶ 17). In addition, three Arizona attorneys who worked on legal matters pertaining to Plaintiff's operations are in Arizona. (*Id.* at ¶ 20). In his supplemental affidavit, Mallmann adds the names of seven additional Arizona attorneys who may have relevant information, and two in New York. (Mallmann Supp. Aff. at ¶ 2(k)-(p)).

Defendants do not dispute that the majority of witnesses with knowledge of Plaintiff's operations and maintenance are in Arizona. However, Defendants attempt to dispute the import of such knowledge by arguing, in their Reply, that the key witnesses are the Canadian professionals involved in the formation of the Agreements requiring interpretation. Defendants point out that the Plaintiff REIT's office is

in Canada. Defendants further assert that they would call at least two Canadian attorneys involved in formation of the Agreements to interpret them. (Losch Aff. at ¶ 8(d)-(e)). Defendants proceed to list additional potential third-party witnesses in Canada: (1) two additional attorneys, (2) dealers that sold units of Plaintiff to investors, and (3) unitholders who invested in Plaintiff. (Losch Aff at ¶ 8, Litwin Aff at ¶ 23).

Defendants further assert that Canadian bankers and accountants may need to testify to assist the Court's evaluation of the breach of fiduciary duty claims. Defendants add that "[m]any of the witnesses with knowledge pertaining to defendants' defense of the fraud claim reside in Canada", but they provide no explanation of who these witnesses might be. (Defs.' Mot. at 11). Finally, at the hearing, counsel for Defendants added that all but one of the REIT's directors live in Canada. Defendants also pointed out at the hearing that creation of the REIT and issuance of the units is at issue in the fourth count for breach of the prospectus.

Plaintiff acknowledges that several Canadian lawyers were involved with the initial offering of Plaintiff's units, but argues that they do not have knowledge of the subsequent management and operations of Plaintiff, the key issues in the action at bar. Plaintiff further asserts that its unitholders are unlikely to be witnesses because this action focuses on the management of Plaintiff's assets. Moreover, Plaintiff disputes Defendants' assertion that all the unitholders are in Canada, and states that, since the units were offered, unitholders have moved and are now located in ten states in the U.S.A., including Arizona, as well as the United Kingdom and several Canadian provinces. (Mallmann Aff. at ¶ 4).

With respect to location of Canadian witnesses, Plaintiff's counsel contended, and Defendants' counsel did not dispute, that, the witnesses are not in Ontario, the location specified in the choice of law pro-

vision. If the action is dismissed and then refiled in Ontario, Canadian witnesses will still have to travel. If the action is refiled in British Columbia, the court hearing the case still would have to apply the law of another jurisdiction—Ontario—to at least some of the claims.

Having reviewed the Complaint in detail, the Court concludes that Plaintiff correctly characterizes the central factual issues in this dispute as those related to the management and operations of Plaintiff, not the creation of Plaintiff and issuance of the investment units. The alleged misconduct relevant to the large majority of the claims occurred mostly in Arizona, and the potential witnesses with information about the alleged misconduct appear to be located in Arizona. The potential witnesses from Canada have more of the information on the creation of Plaintiff and issuance of units, rather than the central issues in this dispute.

In their initial Motion, Defendants also pointed out that accountants from the accounting firm KPMG, Canada, were the auditors who, Plaintiff alleges "resigned because of Losch, Litwin, and Dewar's proposal to include in [Plaintiff's] 1996 financial statements, adjustments which reflected the allocation of certain costs to [Plaintiff] by MPLP and other related entities without appropriate evidence to support the charges." (Defs.' Reply at 7; Compl. at ¶ 121). Defendants' concern about the location of likely Plaintiff's witnesses is commendable. However, that Plaintiff may have Canadian witnesses is of little import to Defendants' request for a change in forum, because Plaintiff made its assessment of the most convenient forum by filing in Arizona.

In their supplemental reply filed before the hearing, Defendants further stated that Plaintiff offered only Canadian witnesses and Canadian documents in support of a request for writ of garnishment in an action in Arizona Superior Court against

one of the Defendants at bar.[2] The witnesses offered were Ian Mallmann, chairman of Plaintiff, and another individual, a representative from the Vancouver, B.C., office of accounting firm Price Waterhouse Coopers. Defendants added that Plaintiff would not accept service of subpoenas on Price Waterhouse or its representative. However, a letter submitted by Defendants indicates that Plaintiff considered much of the Price Waterhouse report to be privileged from discovery. (Letter from Plaintiff's counsel to Defendants' counsel, Exh. B. to Supp. Reply). Moreover, Plaintiffs agreed to produce the two witnesses mentioned above for deposition by the state court defendant, but the depositions were vacated at the latter's request. (Hall Aff. at ¶¶ 6, 8, attached to Plaintiff's Supp. Reply).

At the hearing, counsel for Defendants expressed concern about the ability of her clients to obtain testimony of third-party witnesses in Canada. In its post-hearing supplemental pleading, Plaintiff attached the affidavit of a Canadian attorney, Keith Clark, addressing this issue. Clark avers that Canadian law sets forth a procedure for compelling a person in Canada to give testimony for use in a court outside Canada. (Clark Aff. at ¶ 14). Attached to Clark's affidavit is the law to which he refers, the "Canada Evidence Act," which provides, in relevant part:

> (1) If, on an application for that purpose, it is made to appear to any court or judge that any court … outside Canada, before which any civil, [or] commercial … matter is pending, is desirous of obtaining the testimony in relation to that matter of a party or witness within the jurisdiction of the first mentioned court … the court or judge may, in its or their discretion, order the examination on oath on interrogatories, or otherwise, before any person or persons named in the order, of that party or witness accordingly, and … may command the attendance of that party or witness for the purpose of being examined, and for the production of any writing or other documents … relating to the matter in question ….
>
> (2) For greater certainty, testimony for the purposes of subsection (1) may be given by means of technology that permits the virtual presence of the party or witness before the court or tribunal outside Canada or that permits that court or tribunal, and the parties, to hear and examine the party or witness.

(Canada Evidence Act, R.S., c.E–10, s.46(1)-(2), Exh. to Clark Aff. filed as Exh. 2 to Pl.'s Supp. Post–Hearing Mem.) The statute permits Canadian courts to order the testimony of a Canadian resident, but does not require that they do so. The statute is not conclusive about whether Defendants will have difficulty obtaining testimony of third party witnesses in Canada, but it does establish the existence of a procedure for attempting to do so.

Clark, the Canadian barrister and solicitor, also avers: "It is my experience that it is extremely difficult to compel the attendance of a U.S. citizen to testify at a British Columbia Supreme Court trial if that witness does not voluntarily attend." (Clark Aff. at ¶ 15). Although the Defendants seek to have this action transferred to Ontario, not British Columbia, Clark's affidavit nonetheless indicates that compelling testimony of witnesses outside the forum country is potentially an issue regardless of whether the forum is the United States or Canada.

In sum, the three individual Defendants reside in Arizona, and nine of the ten partnership or corporate Defendants were formed in Arizona. All ten have offices here. Moreover, the majority of the third parties with relevant information are in Arizona. Location of witnesses strongly favors an Arizona forum.

---

**2.** Defendants also assert that the claims in state court are virtually identical to counts ten and eleven in the action at bar, and thus the state court defendant has sought a stay of that action pending resolution of the action at bar.

## 2. Relative ease of access to documentary sources of proof

█ Defendant argues that many of the sources of proof in the action at bar are located in Canada. Documents in Canada include "many" (Losch Aff. at ¶ 6) or "some" (Litwin Aff. at ¶ 21) of [Plaintiff's] records, such as "corporate minutes, corporate legal documents, securities offering documents, investor lists, and other investor records." (Losch Aff. at ¶ 6, Litwin Aff. at ¶ 21). Plaintiff responds that its most current financial records are located in Arthur Anderson's Phoenix office and the Phoenix offices of the Magellan Corporations. (Mallmann Aff. at ¶ 15). Plaintiff adds that all of its financial and operational records predating August 1996 are in the possession of the Arizona Attorney General's office because the latter seized these documents after initiating a criminal probe of the Magellan entities. (Mallmann Aff. at ¶ 21).

Plaintiff further states that current records of the Defendant businesses also are located in Arizona. Plaintiff explains that, at one point, one of the Defendant businesses agreed to provide Plaintiff with all books and records of the limited partnerships that, in turn, controlled the properties Plaintiff purchased. (*Id.* at ¶ ). The agreement was memorialized as part of a larger Stock Purchase and Sale Agreement governed by Arizona law and requiring arbitration of disputes in Phoenix. (*Id.* at ¶ ). When the Defendant that entered this agreement failed to provide the books and records to Plaintiff, the latter instituted arbitration proceedings pending in Phoenix. (*Id.* at ¶ ). The arbitration remains pending. (*Id.*) Plaintiff also states that it has 65 bank accounts, 52 in Arizona and the remainder in California, where its other property is located. (*Id.* at ¶ 9). It has no bank accounts in Canada. (*Id.*)

As in the analysis of witnesses, the central issues in dispute must be considered to determine where most relevant documents are located. The alleged wrongdoing occurred largely in Arizona and the documents related to that wrongdoing, including financial records of Plaintiff, financial records of Defendants, and various bank accounts, are largely in Arizona. Location of access to sources of proof favors an Arizona forum.

## B. Public Interest Factors

█ The public interest factors that must be balanced include:

(1) administrative difficulties flowing from court congestion; (2) imposition of jury duty on the people of a community that has no relation to the litigation; (3) local interest in having localized controversies tried at home; (4) the interest in having a diversity case tried in a forum familiar with the law that governs the action; (5) the avoidance of unnecessary problems in conflicts of law.

*Creative Technology Ltd.*, 61 F.3d at 703–704 (quoting *Zipfel*, 832 F.2d at 1487 (citing *Gulf Oil*, 330 U.S. at 508, 67 S.Ct. 839)). The parties discuss the interests of Canada and Arizona in this litigation, issues related to factors two and three, and factor four, desirability of trying the case in a forum familiar with the relevant law. The fourth factor will be discussed first.

## 1. Interest in having a diversity case tried in a forum familiar with the law that governs the action

Most of Defendants' argument focuses on this interest. Although the choice of law provisions in the three agreements between Plaintiff and MRLP do not mandate a particular venue, choice of law is considered as one factor in the balance of the *forum non conveniens* analysis, due to the public interest in having a case tried in a forum familiar with the governing law.

Defendants initially argue that, because the three agreements are international contracts between Plaintiff and Defendant MRLP, the choice of law provisions are governed by *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). The validity of choice-of-law

provisions in international agreements is determined by application of the standards in *Bremen.* *Batchelder v. Kawamoto,* 147 F.3d 915, 918 (9th Cir.), *cert. denied,* 525 U.S. 982, 119 S.Ct. 446, 142 L.Ed.2d 400 (1998); *Richards v. Lloyd's of London,* 135 F.3d 1289, 1292–93 (9th Cir.), *cert. denied,* 525 U.S. 943, 119 S.Ct. 365, 142 L.Ed.2d 301 (1998). However, Plaintiff does not dispute the validity of the choice of law provision, but rather its scope, i.e., its applicability to the claims other than those alleging breach of the three agreements. *Bremen* is not applicable to this inquiry.

As Plaintiff states in its supplemental post-hearing memorandum, the applicable choice of law principles are those of the forum state, Arizona. *See MRO Communications, Inc. v. AT & T Corp.,* 197 F.3d 1276 (9th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1995, 146 L.Ed.2d 820 (2000). Arizona courts apply the *Restatement (Second) of Conflict of Laws* ("*Restatement*") to determine the law governing multi-state (and presumably multi-national) tort claims. *See Bates v. Superior Court of Arizona,* 156 Ariz. 46, 749 P.2d 1367, 1369 (1988). The principle applicable to contracts containing choice of law provisions is contained in *Restatement* section 187:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Section 187(1) applies to the first three claims, for breach of the three contractual agreements between Plaintiff and MRLP, and requires application of the law selected by the parties as stated in the choice of law provision, i.e., the law of Ontario, Canada. *See Restatement* § 187(1). As stated above, Plaintiff does not dispute that Ontario law applies to these claims.

■ Defendants argue that the choice of law provisions in the three agreements also apply to most of Plaintiff's other claims. Plaintiff disputes this contention. The fourth and fifth claims allege breach of a provision in the prospectus and breach of a promissory note. These claims are not disputes about the three agreements between Plaintiff and MRLP, and thus the choice of law provision in the three agreements does not apply to these claims. Moreover, the promissory note contains an Arizona choice of law provision; therefore, Arizona law must be applied to this claim. *See Restatement* § 187(1). Defendants argue that the defense to the claim of breach of a promissory note will require construction of the agreements, but that does not render the claim one about the agreements.

The remaining claims are largely tort claims. The choice of law applicable to tort claims under Arizona is § 145 of the *Restatement.* It provides:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the oc-

currence and the parties under principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.[3]

Applying § 145, Arizona is the forum with the "most significant relationship to the occurrence[s] and the parties" for the reasons explained in the preceding section. Although Plaintiff was created in Canada, the three individual Defendants are Canadian citizens residing in Arizona and the business Defendants were largely created in Arizona with their principal place of business in Arizona. Most of the witnesses and documents are in Arizona. The misconduct largely occurred in Arizona. It is presently difficult to find with certainty where the injury occurred—the injury to the investors' finances is a result of the injuries to Plaintiff that took place in Arizona, though the investors are largely in Canada. The relationship between the parties is centered in Arizona, where most of the relevant conduct occurred. Because Arizona has the most significant relationship to the occurrences and parties, application of the *Restatement* standard results in the conclusion that Arizona law applies to the tort claims. *Restatement* § 145.

Rather than referring to the *Restatement* standards for choice of law applicable to the tort claims, Defendants argue that the remaining tort claims are subject to the choice of law provision in the contracts because "the tort claims arise out of the contract," and "all of plaintiff's tort claims are based on supposed breach of duties alleged, established, or created by the Canadian contracts."[4] (Mot. at 8). At the hearing, counsel for the Defendants confirmed this argument, stating, "I don't think Your Honor needs to get to the significant contacts analysis unless . . . the choice of law provision that the parties agreed to doesn't apply." The parties do not cite, and the Court did not locate, an Arizona decision addressing the interplay between the application of a contractual choice of law provision broad in scope, an issue of contract interpretation, and the application of the *Restatement* factors.

At the hearing and in its post-hearing memorandum, counsel for Plaintiff indicated that tort claims ordinarily are not controlled by a contractual choice of law provision; rather, they are decided by applying the law of the forum state. *See Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir.1992).

---

3. Section 6, referenced in § 145, provides, in relevant part:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>
> > (a) the needs of the interstate and international systems,
> >
> > (b) the relevant policies of the forum,
> >
> > (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> >
> > (d) the protection of justified expectations,
> >
> > (e) the basic policies underlying the particular field of law,
> >
> > (f) certainty, predictability and uniformity of result, and
> >
> > (g) ease in the determination and application of the law to be applied.

4. Defendants apparently include the twelfth and thirteenth claims, alleging federal and Arizona state RICO violations, when they refer to tort claims. (*See* Mot. at 3–4, including RICO claims in a list of tort claims).

However, counsel for Plaintiff added that the Court should determine the scope of the contractual choice of law provision first, to determine what claims it encompasses.

■ Defendants also argue that the scope of the choice of law provision must be determined first. In support of their position, Defendants cite a Ninth Circuit decision applying California law to a contractual choice of law provision. *See General Signal v. MCI Telecomm. Corp.*, 66 F.3d 1500, 1506 (9th Cir.1995), *cert. denied*, 516 U.S. 1146, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996). The California Supreme Court decision cited in *General Signal* indicates that California courts inquire into the scope of a contractual choice of law provision first. *See Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148, 1153–55 (1992). Claims encompassed by the choice of law provision are governed by the law contained in that provision. *See id.* Under Arizona law, effectuating the parties' intent is the primary goal of contract interpretation. *Ahwatukee Custom Estates Mgmt. Ass'n, Inc. v. Bach*, 193 Ariz. 401, 973 P.2d 106, 109 (1999). Thus, Arizona courts likewise would effectuate the intent of parties who drafted a choice of law provision by applying the chosen law to all claims within the scope of the provision.

In *Nedlloyd Lines*, the California Supreme Court broadly construed the contractual choice of law provision before it, reasoning that such provisions "apply to all causes of action arising from *or related to* their contract.'" 11 Cal.Rptr.2d 330, 834 P.2d at 1153–54 (emphasis added). A portion of the California Supreme Court's reasoning suggests that all choice of law provisions should be construed broadly. For example, it stated:

> When a rational business[ ]person enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion

is that he or she intended that law to apply to all disputes arising out of the transaction or relationship.

*Id.* at 1154. To the extent the California Supreme Court suggests that broad construction of choice of law provisions is always warranted, Arizona courts would diverge because such a construction would not always effectuate the parties' intent.

However, the California Supreme Court did not indicate that broad construction of a choice of law provision is warranted in all circumstances. The choice of law clause at issue provided: " 'This agreement shall be governed by and construed in accordance with Hong Kong law ....' " *Id.* at 1154. The California Supreme Court considered this provision, particularly the phrase "governed by" to be a broad one requiring that the agreement at issue be "completely and absolutely controlled by Hong Kong law." *Id.* To the extent the California Supreme Court relied on the language of the provision before it, Arizona courts would take the same approach.

In concluding that Arizona courts would consider the scope of a contractual choice of law provision in order to effectuate the parties' intent, this Court agrees with the Massachusetts Supreme Court's analysis in a decision requiring application of California law. *See Jacobson v. Mailboxes Etc., U.S.A., Inc.*, 419 Mass. 572, 646 N.E.2d 741 (1995). California courts analyze both choice of law clauses and forum selection clauses in the same manner. *See id.* at 744. The Massachusetts Supreme Court concluded that California courts would not consider a contractual forum selection clause applicable to claims alleging deceit and other wrongs that allegedly induced formation of the contract containing the clause. *See id.* at 744, 745. The Massachusetts Supreme Court relied on the actual language of the forum selection clause before it, stating that the clause "by its terms relates only to actions to enforce the agreement and not to actions based on

unlawful conduct that induced a franchisee to sign the agreement." *Id.* at 745.[5]

Before reviewing the language of the choice of law provision in the action at bar to determine its scope, the Court considers the other decision on which Defendants rely to support their argument that the tort claims in this action are subject to the choice of law provision in the contracts, *A.G. Edwards & Sons, Inc. v. Smith*, 736 F.Supp. 1030 (D.Ariz.1989). In concluding that a choice of law provision applied to supplemental state claims for securities fraud and racketeering, the district court in *A.G. Edwards & Sons, Inc.* did not discuss the scope of the language contained in the choice of law provision. *See id.* at 1035–36. The district court may not have discussed the scope of the applicable language because the plaintiff sought to avoid application of the choice of law provision in its own contract by arguing that the provision was contrary to Arizona public policy. *Id.* The district court rejected this argument, concluding: "It would be disingenuous to allow plaintiff to disregard its own choice of law provision whenever plaintiff believes it would be advantageous to do so." *Id.* at 1036. Because the district court did not address the scope of the choice of law provision, its decision does not support the conclusion that such provisions, regardless of scope, encompass all claims.

The Court proceeds to review the choice of law provisions in the three agreements, between Plaintiff and MRLP. The agreements contain identical choice-of-law provisions, stating:

> This agreement shall be governed by and construed in accordance with the laws of the province of Ontario and the laws of Canada applicable therein and this agreement shall in all respects be treated as an Ontario contract.

(Prop. Mgmt. Agreement § 7.14, Asset Mgmt. Agreement § 5.14, Service Agreement § 7.14, Exhs. 2–4 to Compl.) This choice of law provision is a narrow one requiring application of Ontario law only to disputes about the agreements and their construction. It contains no terms expanding its scope to all disputes "related to" or "in connection with" the agreement. *See Jacobson*, 646 N.E.2d at 745 (construing as broader the term "in connection with" contained in the forum selection clause in *Cal–State Business Prods. and Servs., Inc.*, 16 Cal.Rptr.2d at 420 n. 4).

Defendants assert that the choice of law provision also requires application of Ontario law to the "subject matter" of the agreements. However, the term "subject matter" is found only in the second sentence of the paragraph of each agreement quoted above, a sentence stating, as previously noted:

> The parties hereto irrevocably attorn to the jurisdiction of the court of the Province of Ontario to resolve any dispute which may arise among them concerning this Agreement and the subject matters hereof.

(Prop. Mgmt. Agreement § 7.14, Asset Mgmt. Agreement § 5.14, Service Agreement § 7.14, Exhs. 2–4 to Compl.) The former is the choice of law provision and the latter is the permissive choice of forum provision discussed earlier. Because the two provisions govern different matters, the term "subject matter" cannot be taken

---

5. In contrast, a California court of appeals, in a decision reached prior to the decision in *Jacobson*, 419 Mass. 572, 646 N.E.2d 741, relied on the California Supreme Court decision in *Nedlloyd Lines B.V.*, 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148, to conclude that a forum selection clause encompassed claims alleging false promises made during the formation of the agreement. *Cal–State Business Prods. and Servs., Inc. v. Ricoh*, 12 Cal.App.4th 1666, 16 Cal.Rptr.2d 417, 423–24 (1993). The California court of appeals relied on the reasoning in *Nedlloyd Lines B.V.*, 11 Cal.Rptr.2d 330, 834 P.2d at 1154–55, that such clauses are always broadly construed, without considering the scope of the forum selection clause before it. *See Cal–State Business Prods. and Servs., Inc.*, 16 Cal.Rptr.2d at 423–24. As stated above, Arizona courts would reject such an approach as contrary to the goal of effectuating the parties' intent.

from the second sentence and added to the first to expand the scope of the choice of law provision. The choice of law provision remains narrow—Ontario law applies to disputes about the agreements and their construction, not to all disputes about any claim remotely involving the subject matter of the agreements.

■■■ The Court proceeds to consider whether the remaining tort claims in this action are outside the narrow scope of the choice of law provisions. Plaintiffs argue that the sixth claim, for breach of duty by Officer/Trustees Losch, Litwin, and Dewar, and by MRLP, and the seventh claim, aiding and abetting the breaches of duty, are not in the scope of the choice of law provision. Plaintiff is correct in part because it alleges in the sixth claim that Losch, Litwin, and Dewar's duties of good faith and loyalty arose, not from contract provisions, but from their role as Trustees and/or Officers. These roles are defined in the Declaration of Trust, a document containing a Maryland choice of law provision. However, Plaintiff is partially incorrect because it alleges that MRLP's duties to act in good faith arose from the agreement to hold Plaintiff's funds in trust under the terms of the PMA. (Compl. at ¶ 151). Thus, the duty MRLP allegedly breached stems from the PMA. To the extent that the claims involve MRLP's duties, the torts alleged in claims six and seven are in the scope of the choice of law provision, and thus the provision applies to them. To the extent that the claims involved Losch, Litwin's and Dewar's duties, the choice of law provision is inapplicable.

■■■ Review of the Complaint reveals that a portion of the conduct alleged in support of the remaining tort claims is similar to the conduct alleged in support of the claims for breach of the three agreements, and a portion is not. In the first two breach of contract claims, Plaintiff alleges that MRLP breached each agreement by:

> Claiming and receiving an [Asset or Property] Management Fee for years

when the minimum requirement for payment of the fees had not been met.

Compl. at ¶¶ 134(e), 137(e). In all three breach of contract claims, Plaintiff further alleges that MRLP breached each agreement by:

> Claiming and receiving (directly or through an affiliate) "allocated cost recoveries," which constitute reimbursement for costs of a general and administrative nature; and

> Claiming and receiving (directly or through an affiliate) payment for a "refinancing fee."

(Compl. at ¶¶ 134(f)-(g), 137(f)-(g), and 140(e)-(f)). This conduct is part of the basis for most of the tort claims. In the fraud claim, Plaintiff alleges:

> On numerous occasions, all as set forth above, defendants falsely represented that [Plaintiff] owed them reimbursements under the Original Agreements, [and] omitted facts that would have revealed the improper nature of the "allocated cost recoveries," the unauthorized alteration of [Plaintiff's] fundamental structure, and the unauthorized New Agreements.

(Compl. at ¶ 161). The "reimbursements" Defendants allegedly falsely represented that Plaintiff owed are detailed in the breach of contract claims: the property and asset management fees, the "allocated cost recoveries," and the payment for a "refinancing fee." Thus, Plaintiff is alleging that Defendants made false representations or omitted facts to obtain payment of fees to which they were not entitled under the three agreements. However, Plaintiff also alleges that Defendants omitted facts that would have revealed the improper nature of acts not related to the three Agreements, including "the unauthorized alteration of [Plaintiff's] fundamental structure," established in the Declaration of Trust, and "the unauthorized New Agreements" allegedly created by the Limited Partnerships to obtain payments

from Plaintiff larger than those specified in the three original agreements.

Several of the other tort claims are also partially based on the allegations of misconduct set forth in the breach of contract claims and partially based on other allegations of misconduct, including those pertaining to alteration of Plaintiff's structure and development of unauthorized new agreements. In the negligent misrepresentation claim, Plaintiff alleges:

> On numerous occasions, defendants provided Plaintiff with false or incorrect information. Specifically, defendants represented that [Plaintiff] owed them reimbursements under the Original Agreements . . . [and] omitted facts that would have revealed the improper nature of the "allocated cost recoveries," the unauthorized alteration of [Plaintiff's] fundamental structure, and the unauthorized New Agreements.

(Compl. at ¶ 170). In the conversion claim, Plaintiff alleges payment of fees not authorized by the three original agreements, plus other misconduct. Specifically, Plaintiff alleges that Defendants:

> knowingly and wilfully us[ed] [Plaintiff's] assets to provide a loan to MPLP without authorization for their own benefit;
>
> knowingly and wilfully transferr[ed] [Plaintiff's] shares in Magellan Canterbury, Inc. and Magellan Maryland Meadows, Inc. to Magellan REIT GP Shareholder LLC for no consideration or for wholly inadequate [consideration] and without [Plaintiff's] authorization; and
>
> knowingly and wilfully us[ed] [Plaintiff's] funds to pay MRLP (directly or through an affiliate) fees not authorized under the Original Agreements or the offering materials.

(Compl. at ¶ 178(a)-(c)). In the Eleventh Claim requesting an Accounting and a Constructive Trust, Plaintiff alleges:

> Defendants Losch, Litwin, Dewar, and MRLP, after, and as a part of breaching their duties to Plaintiff, received monies

from Plaintiff which were diverted or misappropriated for their own benefit. Defendants diverted a portion of these funds to MPLP to purchase the Galleria Palms project, which is currently held by Magellan Galleria Palms Limited Partnership, the general partner of which is Magellan Galleria Palms Property I, LLC. Other portions have been diverted to Losch, Litwin, Dewar, and MRLP directly.

(Compl. at ¶¶ 182–83).

Although these tort claims are partially based on the conduct underlying the breach of contract claims, they also contain allegations of a great deal of conduct other than that alleged to be a breach of the three agreements. Due to the breadth of the factual allegations on which they are based, these tort claims are not within the narrow scope of the choice of law provision in the three agreements at issue in this action. The choice of law provision applies only to the extent that part of the wrongdoing alleged in the tort claims requires construction of the three agreements—the agreements must be construed under Canadian law.

Plaintiff also points out that the three contractual agreements containing the choice of law provisions do not bind all of the Defendants. The parties to the agreement are Plaintiff and MRLP, one of the Defendants. In its initial Response, Plaintiff argued that none of the other Defendants were agents of MRLP. At the hearing and in the post-hearing supplemental memorandum, Plaintiff further argued that MRLP was the agent of the three individual Defendants, Losch, Litwin, and Dewar. For support, Plaintiff relies on portions of the Complaint alleging that MRLP acted at the direction of the individuals. For example, Plaintiff alleges: "In 1997, MRLP, at the direction of Losch, Litwin, and Dewar, attempted to extract from [Plaintiff] additional reimbursement for claimed issuance costs in order to offset amounts that Magellan Properties Limited Partnerships had improperly borrowed

from [Plaintiff] to fund other failing investment vehicles." (Compl. at ¶ 75).

In contrast, Defendants argue that the three individual were the agents of MRLP. If the individual Defendants are agents of MRLP, then they may invoke the choice of law provision to the same extent that MRLP may invoke it, i.e., to analyze the breach of contract claims, and to engage in interpretation of the three contracts to the extent necessary for the other claims. *See Britton v. Co-op Banking Group,* 4 F.3d 742, 744 (9th Cir.1993).

Neither party discusses the applicable law of agency thoroughly enough in their post-hearing pleadings for the Court to determine whether the individuals were agents or vice versa. However, whether MRLP is the agent or the principal, it is the party to the contract. To the extent the claims require determination of whether the contract was breached, the MRLP and Plaintiff, the other party to the contract, chose to apply Ontario law and thus Ontario law must govern the interpretation of the contract.

In sum, several of the claims in this action require the application of the law of Ontario, Canada, while others require application of the law of Arizona. Forum familiarity with governing law does not favor either party strongly.

### 2. Interest in having localized controversies tried locally

Both Arizona and Canada have an interest in this litigation. All of the investors in Plaintiff were initially in Canada, though Plaintiff avers that they now live in several locations, including Great Britain and ten states in the U.S.A. As Defendants argue, Canada has an interest in redress of financial losses of its citizens. However, Plaintiff's real estate is all located in Arizona and California. The state of Arizona has an interest in actions pertaining to Arizona real estate.

The majority of the purported misconduct also occurred in Arizona. As con-

firmed by the action of the Arizona Attorney General's office, the state of Arizona has an interest in addressing wrongdoing that occurs in the state. As Plaintiff points out, a district court in New York stated that "[i]t would be incongruous" to grant a motion to dismiss on ground of forum non conveniens while a related criminal action proceeded in the district. *In re Livent, Inc. Securities Litig.,* 78 F.Supp.2d 194, 212 (S.D.N.Y.1999).

In addition, as stated previously, Losch and Litwin stated in their motion for dismissal in the action in British Columbia mentioned above that, other than the fact that many of Plaintiff's unitholders reside in British Columbia, "[t]here is no other significant connection between the trust[, i.e., Plaintiff,] and th[e British Columbia] jurisdiction." (Motion, Exh. 2 to Plaintiff's Response). This statement reduced the legitimacy of Defendants' assertions about the primacy of the Canadian interests. The balance of the community interests favors an Arizona forum.

### C. Conclusion on Balance of Public/Private Factors

The balance of public and private factors favors keeping this action in Arizona because most of the alleged misconduct at issue occurred in Arizona and the bulk of the relevant witnesses and documents are located in Arizona. The choice of law provision requiring that Canadian law be applied to the breach of contract claims, and to the other claims to the extent they require interpretation of the three agreements, is a factor weighing against an Arizona forum, but many other claims require application of Arizona law. Moreover, choice of law is merely one factor that is, alone, not conclusive. The parties' relationship during the alleged incidents was centered in Arizona. Along with location of witnesses and documents, these factors tip the balance in favor of an Arizona forum.

### Motion to Dismiss RICO Claims

■ Defendant argues that the RICO claims should be dismissed because the choice of law provisions in the three agreements govern all of the claims, and thus the United States and Arizona state RICO statutes cannot be applied. Defendant argues that the RICO claims "center around" and "arise out of" the three agreements and "would require interpreting those agreements and the Canadian law governing them." (Def.'s Mot. at 3).

In the federal RICO claim, Plaintiff alleges:

> Defendants, through a pattern of conduct, used the United States mail and wires to defraud [Plaintiff] and divert money belonging to [Plaintiff] to defendants' other financial ventures. Specifically, by mail, facsimile, and phone, defendants falsely represented that [Plaintiff] owed them reimbursements under the Original Agreements and omitted facts that would have revealed the improper nature of the "allocated cost recoveries," the unauthorized Loan, the unauthorized alteration of [Plaintiff's] fundamental structure, and the unauthorized New Agreements.

(Compl. at ¶ 189). Similarly, in the Arizona state RICO claim, Plaintiff alleges:

> [D]efendants, pursuant to a common scheme, knowingly diverted, converted, and stole [Plaintiff's] funds. Defendants further engaged in "a scheme or artifice to defraud" ... Specifically, defendants represented that [Plaintiff] owed them reimbursements under the Original Agreements, and omitted facts that would have revealed the improper nature of the "allocated cost recoveries" the unauthorized Loan, the unauthorized alteration of [Plaintiff's] fundamental structure, and the unauthorized New Agreements.

(Compl. at ¶ 194). The RICO claims, like the tort claims discussed above, are based in part on the same conduct underlying the breach of contract claims—purported requests for reimbursements not authorized by the three agreements. However, the RICO claims, like the tort claims, are also based on additional conduct separate and apart from breach of the three agreements—omissions that would have revealed the improper nature of the unauthorized loan, the unauthorized alteration of [Plaintiff's] fundamental structure, and the unauthorized new agreements. Because the conduct alleged, as a whole, is far broader than that alleged in the breach of contract claims, the RICO claims, like the tort claims discussed above, are not within the narrow scope of the choice of law provisions in the contracts. Because the law of the United States and Arizona applies, the claims need not be dismissed.

Accordingly,

**IT IS ORDERED** granting Defendants' request for leave to file a supplemental Reply.

**IT IS FURTHER ORDERED** denying Defendants' Motion to Dismiss on grounds of forum non conveniens. (Dkt.# 6).

**IT IS FURTHER ORDERED** denying Defendants' Motion to Dismiss the federal and Arizona state RICO claims. (Dkt.# 7–1, 7–2).